ꞰMER & ASSOCIATES LLC
ɔrneys for Plaintiff
fice and Post Office Address
o0 East 42nd Street, Suite 2430
New York, NY  10165
212-297-0700

**DOC #** ___

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JUDGE HOLWELL

-----------------------------------------------------------------X

KAREN NOVICK

                        Plaintiff,

**'09 CIV 6865**
COMPLAINT

                -against-

METROPOLITAN LIFE INSURANCE COMPANY and

METLIFE OPTIONS AND CHOICES PLAN NO. 512

                        Defendants.

-----------------------------------------------------------------X

## I.    NATURE OF ACTION, JURISDICTION AND VENUE

1.    This action arises under the Employee Retirement Income Security Act of 1974 [hereinafter "ERISA"] 29 U.S.C. §§1001, *et seq.*, and more particularly Section 1132(a)(1)(B) thereof.

2.    Jurisdiction is vested in this Court because of the presence of a federal question, 28 U.S.C. §1331, and the Court's jurisdiction under ERISA, 29 U.S.C. §1132.

3.    Venue is proper in this judicial district and pursuant to ERISA, 29 U.S.C. §1132(e)(2) because the breach took place in this district and venue and a defendant may be found in this district and venue.

## II.    THE PARTIES

4.    Plaintiff Karen Novick [hereinafter "Ms. Novick"] is an individual residing at 500 Mountain Road, Larksville, Pennsylvania and is a citizen of the Commonwealth of Pennsylvania.

5.   Defendant, MetLife Options and Choices Plan No.512 [hereinafter "the Plan"] is an Employee Welfare Benefit Plan established pursuant to ERISA, 29 U.S.C. §1002(1) and designed to provide, *inter alia*, disability insurance coverage to the eligible employees of the Metropolitan Life Insurance Company, including plaintiff.

6.   Defendant Metropolitan Life Insurance Company [hereinafter "MetLife"] is, upon information and belief, a corporation incorporated under the laws of New York with its principal place of business located at One Madison Avenue, New York, NY 10010-3690, is, at all relevant times herein and upon information and belief, the Administrator and/or ERISA plan fiduciary, as those terms are defined by ERISA, 29 U.S.C. §§1002(16)(A), (21)(A) of the Plan.

7.   At all relevant times herein, Ms. Novick is a "participant" as that term is defined by ERISA, 29 U.S.C. §1002(7) of the Plan.

## III.   **MATERIAL ALLEGATIONS OF FACT**

8   At all relevant times herein, the Plan provides its participants with both Short Term Disability [hereinafter "STD"] coverage and Long Term Disability [hereinafter "LTD"] coverage and, upon information and belief, is funded through employer contributions and a non-exempt welfare benefit trust.

9.   On or about January 6, 2007, Ms. Novick, while a participant in the Plan, receives a tick bite, subsequently develops Lyme disease and since suffers on a regular basis symptoms that include joint pain, muscle burning, joint stiffness, problems with balance, difficulties with attention, concentration and memory and severe fatigue.

10.   On or about February 6, 2007, Ms. Novick was compelled because of sickness to cease her work for MetLife as a Business Systems Analyst in MetLife's Information Technology department in Moosic, Pennsylvania.

11.   At all relevant times herein, the terms "Disabled" or "Disability" under the Plan's STD coverage are defined as:

> **"Disabled"** or **"Disability"** means that due to illness or accidental injury:
>
> You are receiving appropriate care and treatment from a doctor on a continuing basis; and
>
> You are unable to earn more than 80% of your pre-disability earnings at your own occupation for any employer in your local economy:
>
> Your loss of earnings must be a direct result of your illness or accidental injury.  Economic factors such as , but not limited to, recession, job

2

obsolescence, pay cuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.

12. At all relevant times herein, the terms "Disabled" or "Disability" under the Plan's LTD coverage are defined as:

> **"Disabled"** or **"Disability"** means that due to sickness, pregnancy or accidental injury:
>
> You are receiving appropriate care and treatment from a doctor on a continuing basis;
>
> During the first 12 months of disability, including the period of short term disability, you are unable to earn more than 80% of your pre-disability earnings at your own occupation for any employer in your local economy; and
>
> After the first 12 months of disability, including the period of short term disability, your are unable to earn more than 80% of your indexed pre-disability earnings from any employer in your local economy, at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and pre-disability earnings.
>
> Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury.  Economic factors such as , but not limited to, recession, job obsolescence, pay cuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.

13. At all relevant times herein, the Plan defines the term "Appropriate Care and Treatment" as:

> **"Appropriate Care and Treatment"** means medical care and treatment that meet all of the following:
>
> Is received from a doctor whose medical training and clinical experience is suitable for treating your Disability;
>
> Is necessary to meet your basic health needs and is of demonstrable medical value;
>
> Is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies;
>
> Is consistent with the diagnosis of your condition; and
>
> Its purpose is maximizing your medical improvement.

14. In February, 2007, Ms. Novick makes claim for STD benefits under the Plan.

15. On or about March, 2007, defendants approve Ms. Novick's claim for STD benefits under the Plan initially through March 23, 2007; defendants subsequently extend Ms. Novick's STD benefits several times through June 8, 2007.

3

17.  By letter dated July 23, 2007, defendants through Allan Boreland, Disability Case Manager, inform Ms. Novick that her STD benefits under the Plan are being terminated:

> This letter is in regard to your claim for Short-Term Disability benefits. After conducting a complete review of your file, we have concluded the medical information supplied docs not support your continued eligibility for Short-Term Disability benefits beyond 6/11/07. According to your plan, "disabled means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and are unable to earn more than 80% of your pre-disability earnings at your own occupation for any employer in your local economy."
>
> Our records indicate you have not worked full time as of 2/6/07 due to chronic fatigue and muscle weakness. Your claim. was approved from 2/7/07 through 6/8/07. A Clinical Specialist reviewed an office visit note from Dr. Prater dated 06/27/2007 and a neurology consult dated 04/17/2007, Dr. Turel. There was no documentation of medical findings to support a functional impairment that would prevent you from performing the duties of your occupation [sic] from Dr. Prater or Dr. Turel. The exam findings were essentially negative by both physicians. Both physicians report that you have reported fatigue, joint pain, joint stiffness as well as symptoms of neuralgia, however, there were no documented medical findings to support your self reported symptoms. In fact, Dr. Turel indicated: 'examination actually looked fairly stable. While she had symptoms of diffuse discomfort of dyesthesia [sic], I could not account for them.' His exam was negative. Dr. Prater did not provide any exam findings, but indicated the exam findings had not changed. There were no significant abnormal findings found in any of the medical documentation provided by Dr. Prater.
>
> For your claim to be considered for benefits beyond 06/08/2007, documentation of medical findings that support a functional impairment that prevents you from performing the duties of your occupation, would need to be submitted. For claim reconsideration, kindly submit any abnormal findings, office visit notes, referrals or consultations not previously submitted for review.

*See* the true and correct copy of Mr. Boreland's July 23, 2007 Letter attached hereto and incorporated herein as **COMPLAINT EXHIBIT 1**.

18.  As part of the documentation in support of her internal appeal of defendants' July 23, 2007 termination decision, Ms. Novick submits the medical records of her examination and treatment by Dr. Richard I. Horowitz, one of the foremost authorities in the United States on Lyme Disease, and a October 10, 2007 letter report in which Dr. Horowitz writes:

Ms. Novick was seen on consultation by our office on 9/27/07 for multiple chronic and debilitating symptoms. She was in her usual state of health until suffering an embedded tick bite on January 6, 2007, and a week later fell ill with symptoms consistent with acute Lyme disease. She is severely impaired by her symptoms which include: chills, sweats, severe fatigue, joint pains which affect her elbows, wrists, hands, fingers, ankles, and knees, stiffness, muscle twitching, significant burning pains in her body, significant brain fog and confusion, difficulty with concentrating and reading, poor memory, and mood swings. Currently she is only functioning at an estimated 35% of normal.

Because of her multiple chronic fibromyalgia-like symptoms. her cognitive impairments. and her severe neuralgia the patient is disabled at this time. She has had an extensive workup through other medical specialties and no other cause of her condition has been identified. She has a panoply of symptoms that are consistent with chronic neurologic Lyme disease and multiple studies in the peer-reviewed medical literature have documented the ability of Lyme disease to persist despite antibiotic therapy. It is our opinion that Ms. Novick is unable to uphold the responsibilities of her job or of any gainful employment at this time, and that her current condition is the result of Lyme disease.

Thank you very much fur help with the care of this very ill patient.

*See* the true and correct copy of Dr. Horowitz's October 10, 2007 Letter Report attached hereto and incorporated herein as **COMPLAINT EXHIBIT 2**.

19. Defendants subsequently take steps to obtain a medical record review report that would support its denial of Ms. Novick's STD benefits claim by retaining Network Medical Review Company [hereinafter "NMR"].

20. In *Nolan v. Heald College*, 551 F.3d 1148, 1152 n.3 (9th Cir. 2009), the U.S. Court of Appeals for the Ninth Circuit found that:

According to Network Medical Review's President and Chief Executive Officer, from 2002 through at least 2005, Network Medical Review and MetLife had a "business relationship . . . whereby MetLife engaged [the] services of [Network Medical Review] to obtain independent medical opinions on the medical conditions of individuals seeking benefits under MetLife disability insurance policies." The evidence indicates that MetLife paid Network Medical Review $236,490 in 2002, $569,795 in 2003, $838,265 in 2004, and $1,671,605 in 2005 for these independent medical opinions. By 2005, 25.62% of Network Medical Review's gross income was attributable to payments from MetLife.

21. According to MetLife's Answers to the Interrogatories served upon it in *Dilley v. Metropolitan Life Ins. Co.*, No. C 07-01831 PJH, U.S. District Court for the Northern District of

California, MetLife has paid NMR more than $11 million during the time period 2002 to 2007 for medical record reviews, including $2,974,913.73 in 2006 and $3,343,980.48 in 2007.

22. Upon information and belief, NMR selected D. Dennis Payne, Jr., M.D., a rheumatologist whose medical record review services MetLife has used repeatedly over the years to deny disability benefits claims.

23. In his November 19, 2007 report, Dr. Payne concludes:

1. Does the medical information support functional limitations (physical or psychiatric) beyond 06/08/07? Functional limitations include any reduction in the ability to work full time.

No. The objective medical record data **do not support any objective findings** that would be expected to be producing restrictions or limitations on activities.
\*                                      \*                                      \*
Following a careful and thorough review of the medical record data, there are **no objective findings in the medical records** that would necessitate the placement of restrictions or limitations on activities. Although she may in fact have a manifestation of chronic CNS Lyme disease, there are no findings that would lead this reviewer to state that this process is producing any degree of an inability to work. Therefore, Ms. Novick is capable of unrestricted work.

*See* the true and correct copy of Dr. Payne's November 14, 2007 Report attached hereto and incorporated herein as **COMPLAINT EXHIBIT 3** (emphasis added).

24. Without knowledge of or having been provided defendants with a copy of Dr. Payne's November 14, 2007 Report, Ms. Novick submits additional records in support of her STD benefits claim, including an additional report by Dr. Horowitz dated January 11, 2008, wherein Dr. Horowitz writes, *inter alia*:

It is our understanding that at this point Ms. Novick has been denied disability and that the reasons given for this decision are that there is a lack of objective findings to support that she is ill, and that her condition has not been demonstrated to be disabling. We disagree strongly with this denial as it does not reflect a thorough review of her medical records and the known medical literature regarding Lyme disease. Additionally, we feel that this decision does not reflect the fact that Ms. Novick has tested positive for elevated levels of the toxic metals lead and mercury--something that is associated with neurologic disorders and other chronic health problems. To more fully illustrate the reasons for our conclusion that she is indeed disabled and that her symptoms are consistent with neurologic Lyme disease as well as with the conditions of fibromyalgia and chronic fatigue syndrome we have submitted to her attorney a significant body of medical literature reviewing many crucial points regarding Lyme disease as it

pertains both to issues of diagnostic testing and to patient evaluation and treatment. Because the amount of material submitted is quite lengthy we have also elected to summarize her case with some of the most relevant medical literature as described below.

*See* a true and correct copy of Dr. Horowitz's Letter Report dated January 11, 2008 attached hereto and incorporated herein as **COMPLAINT EXHIBIT 4**.

25. Although defendants subsequently forward a copy of Dr. Horowitz's January 11, 2008 letter report to Dr. Payne for review, they do not forward the "significant body of medical literature reviewing many crucial points regarding Lyme disease as it pertains both to issues of diagnostic testing and to patient evaluation and treatment."

26. In his subsequent February 8, 2008 report, Dr. Payne concludes:

In reviewing the medical records, the information is essentially consistent with all of the previously submitted data with multiple somatic symptoms and multiple subjective features with no objective information being noted.

IN ANSWER TO YOUR SPECIFIC QUESTIONS:
1. Does the additional information change your previous opinion? Please explain.

No. Following a review of the additional data as noted above, there is only a reiteration of multiple somatic complaints and subjective symptoms**.** There is no objective basis in any of the examinations or workup data. The question of whether or not Ms. Novick has Lyme disease, in the opinion of this reviewer, is not the issue. The question here is whether there are any objective findings in any of this medical record data that would necessitate the placement of restrictions and limitations on activity. In my review of the additional medical information, **there is again no objective findings** that would necessitate the placement of restrictions and limitations on activities whether it be related to fibromyalgia and/or Lyme disease or some other rheumatic condition. Therefore, from a rheumatology viewpoint, my opinion is unchanged that she is capable of unrestricted work.

*See* the true and correct copy of Dr. Payne's February 8, 2008 Report attached hereto and incorporated herein as **COMPLAINT EXHIBIT 5** (emphasis added).

27. By letter dated February 12, 2008, defendants through Eric Kelly, Appeals Specialist, inform Ms. Novick that they are denying her appeal of defendants' termination of her STD benefits under the Plan, writing, *inter alia*, that:

We reviewed her complete claim. All medical information in the claim file has also been reviewed by an Independent Physician Consultant, Board Certified in Rheumatology and Internal Medicine.

Ms. Novick went out of work on February 7, 2007 due to Lyme disease. Benefits were approved through June 8, 2007, and then subsequently terminated due to medical not supporting disability under the Plan.

Ms. Novick's cervical spine MRI revealed modest degenerative change. An MRI of the brain in March 2007 revealed a few nonspecific foci in the subcortical white matter. A lumbar puncture was reported to be normal. Most of the lab work in the file was reported to be within normal limits. Dr. Horowitz reported that Ms. Novick's Western Blot Lyme serology was positive due to one of the unusual bands being positive, although the summation test was reported to be negative by CDC criteria. The examinations on file indicated tender points on evaluation. No synovitis or extra-articular manifestation were noted in the examinations. Ms. Novick was treated with medications for her condition.

According to the independent physician who reviewed Ms. Novick's claim. the medical information on file does not validate functional limitations. The consultant does not disagree that Ms. Novick may have chronic Lyme disease. However, the consultant concludes that there are no clinical findings that would evidence restrictions and limitations on Ms. Novick's activities.

While we do not dispute Ms. Novick's diagnosis, the available information does not demonstrate that she was unable to perform the essential duties of her occupation as a business systems analyst as of June 9, 2007. Therefore, she does not satisfy the plan's definition of disability. As such, the previous claim determination was appropriate, and remains in effect.

*See* the true and correct copy of Mr. Kelly's February 12, 2008 Letter attached hereto and incorporated herein as **COMPLAINT EXHIBIT 6**.

28. At all relevant times herein, defendants knew to be untrue their claim that: "All medical information in the claim file has also been reviewed by an Independent Physician Consultant, Board Certified in Rheumatology and Internal Medicine."

29. At all relevant times herein, defendants' investigation and review of Ms. Novick's claim for STD benefits were infected with serious procedural irregularities designed to manufacture a basis to terminate Ms. Novick's STD benefits claim prematurely for the additional purpose of further insulating defendants against Ms. Novick's anticipated claim for LTD benefits Policy benefits under the Plan.

30. These procedural irregularities and/or conflicts of interest included, *inter alia*:

- Basing its appeal decision upon a medical record review generated by a company for whom a major portion of its gross income is attributable to payments from MetLife;

- Ignoring the fact that none of the physicians and nurses upon whose opinions defendants relied in making their claims decisions ever treated Ms. Novick, examined her or even observed her in any work context;

- Rejecting the substantial clinical and objective evidence of Ms. Novick's disabling condition by misrepresenting that evidence as not constituting "objective medical evidence," which is in itself a type of proof not required under the terms and conditions of the Plan, all in violation of the law of this and other U.S. Circuit Courts of Appeals. *See, e.g., Mitchell v. Eastman Kodak Co.,* 113 F.3d 433 (3d Cir. 1997)(finding insurer's demand for "objective medical evidence" arbitrary and capricious where not required by the policy); *House v. Paul Revere Life Ins. Co.,* 241 F.3d 1045, 1048 (8th Cir. 2001)("nothing in the terms of the plan support Paul Revere's demand for 'objective medical evidence'"); *Connors v. Connecticut General Life Ins. Co.,* 272 F.3d 127, 136 (2d Cir. 2001)("It has long been the law of this Circuit that 'the subjective element of pain is an important factor to be considered in determining disability'"); *Cohen v. Standard Ins. Co.,* 155 F. Supp. 2d 346, 354 (E.D. Pa. 2001)("defendant's denial merely rested upon its conclusion that objective medical evidence does not support the link between work stress and increased risk of accelerating heart disease. However, the Plan does not state that plaintiff is required to prove his claim through the presentation of objective medical evidence"); *Solomon v. Metropolitan Life Ins. Co.,* 2009 U.S. Dist. LEXIS 5150 at *31 (S.D.N.Y. June 18, 2009)("Although several courts in this District have rejected the argument that it is *prima facie* unreasonable for an administrator to base its denial on a lack of objective medical evidence of total disability where the Plan does not explicitly require such proof, such a requirement may in fact be unreasonable in the context of a particular case"); *Magee v. Metropolitan Life Ins. Co.,* 2009 U.S. Dist. LEXIS 59205 at *21-22 and n. 3 (S.D.N.Y. June 22, 2009)(MetLife improperly rejected Magee's claim because Magee failed to provide "objective evidence," establishing that he was suffering from a disabling impairment: "While Dr. Payne's statement that there were no 'objective measures to support functional limitations,' could be construed as seeking evidence of Magee's limitations, rather than a diagnosis of

9

CFS, this single sentence is inadequate notice of what evidence could meet a functional limitations requirement and MetLife never followed this reasoning in its rejections").

31. On several occasions, defendants' representatives inform Ms. Novick that she is not permitted to file her claim for LTD benefits under the Plan until she had received all of her STD benefits.

32. At all relevant times herein, these representations are false and are refuted by instructions in the Plan documents that a LTD claimant "should file the claim after four months of disability."

33. By letter dated May 26, 2009, which is received by defendants on May 27, 2009, Ms. Novick submits her claim for LTD benefits under the Plan. *See* the true and correct copy of Ms. Novick's May 26, 2009 Cover Letter, with Proof of Receipt by defendants, attached hereto and incorporated herein as **COMPLAINT EXHIBIT 7**.

34. As part of the documentation in support of her LTD benefits claim, Ms. Novick submits the Neuropsychological Report of Michael J. Raymond, Ph.D. dated August 25, 2008, in which Dr. Raymond writes, *inter alia*, that:

NEUROPSYCHOLOGICAL FINDINGS

By history (educational/vocational) and the cognitive date obtained, it appears that Ms. Novick premorbidly functioned within the average range of general intelligence. With this benchmark in mind, the following functions were judged below anticipated levels:

Attention/Concentration (fluctuating)
Information Processing Speed (slowed)
Verbal/Visual Memory
Manual Motor Speed (bilateral UE)
Grip Strength (bilateral UE)
Executive Functions

All other functions assessed (i.e., fund of general information, vocabulary, auditory comprehension, reading auditory discrimination of rhythmic sounds, auditory perception met anticipated performance criteria.
*     *     *
In summary, the above enumerated findings, with a reasonable degree of neuropsychological certainty, represent a blend of etiologies including primary pain and fatigue and behavioral alterations likely due to an autoimmune disorder (i.e. Lyme disease).

*See* the true and correct copy of Dr. Raymond's August 25, 2008 Neuropsychological Report attached hereto and incorporated herein as **COMPLAINT EXHIBIT 8**.

35. Also as part of the documentation in support of her LTD benefits claim, Ms. Novick submits the Vocational Evaluation Report of Mark Lukas, dated February 11, 2009, in which Dr. Lukas writes, *inter alia*, that:

> Testing conducted during this evaluation was structured over the course. of a two day work simulation. At the commencement of the first day, Ms. Novick participated in a structured interview and initial intellectual, academic and aptitude testing. Thereafter, through the course of the second day, she had engaged in intellectual assignments primarily associated with reading and summarizing materials encompassing complexities. During the course of the first day, owing to the intensity of her symptomatology, she required a period of approximately 40 minutes to lie down during the morning hours. In the afternoon of the first day, she became fatigued which necessitated an additional period of about 55 minutes in which she was required to rest. On the second day, in addition to a mid-day break, her symptomatology had progressed such that she required frequent breaks during the morning hours. It should be noted that on the afternoon of the second day, her reported symptomatology had advanced to a point which required that she lie down for a period approaching one hour and 15 minutes. She noted the significant onset of fatigue during the course of the two day structured interview and testing protocol.
>
> In regard to testing undertaken the first day of evaluation, Ms. Novick tested with intellect within the upper end of the average range. Her academic capabilities were generally consistent with her educational attainment level with respect to reading and basic sentence comprehension. She placed below average on a measure of clerical ability and above average on a measure of supervisory capability. At the conclusion of the second day, Ms. Novick had participated in a measure of narrative reading comprehension and placed below average both in terms of reading rate and comprehension capabilities. She reported the onset of significant fatigue during the course of the second day of evaluation.
>
> \*                                        \*                                        \*
>
> Based upon findings in this evaluation and the documents reviewed, it is quite evident that Ms. Novick is now significantly impaired in the aftermath of the diagnosis of Lyme disease in early 2007. She now experiences 'a significant constellation of symptomatology which has remained unremediated despite ongoing medical care. She continues with joint and muscle pain, stiffness, balance problems, difficulties with memory, concentration and attention and a significant level of fatigue. While there is discord in the medical records reviewed concerning the presence of objective medical data supporting her symptoms, it is evident that, prior to the Lyme disease exposure, Ms. Novick had been a full and active

participant in the job market engaged in administrative, managerial, supervisory and other occupational areas capitalizing upon well developed cognitive and intellectual capabilities within a business and software applications environment in the telecommunications industry. She had maintained a steady presence in the job market with ascending responsibilities over the course of her career. In the aftermath of the diagnosis of Lyme disease and ensuing symptoms, Ms. Novick had briefly attempted to return to work in a telecommuting circumstance, however, was simply unable to meet the intellectual demands and complexities of her employment. There is medical consensus among her treating physicians concerning the scope and intensity of her symptoms and she has been medically identified as disabled.

Through the course of the two day vocational evaluation, Ms. Novick's symptomatology, particularly with respect to fatigue, had become quite conspicuous despite her efforts to persevere through the course of the evaluation. She required frequent rest periods and, at times, appeared quite lethargic and fatigued, particularly through the course of the day. It is noteworthy that initial testing undertaken at the commencement of the evaluation reflected well developed intellect and intact academic capabilities. Testing undertaken at the conclusion, of the two day evaluation reflected significantly diminished reading efficiency and reading comprehension capabilities. It is evident that in her present state of health, Ms. Novick would not be able to meet the customary demands generic to any type of competitive employment. This includes factors such as consistency and regularity in attendance arid punctuality, an ability to meet reasonable employer established productivity standards and the capability to interact effectively with co-workers, supervisors, the general. public, etc., and to do so on a continuous and sustained basis. It is evident that the presence of her symptomatology now prevents Ms. Novick from meeting these very basic and generic characteristics of competitive employment. Accordingly, she remains disabled and unable to participate in meaningful job market activities.

*See* the true and correct copy of Dr. Lukas' February 11, 2009 Vocational Evaluation Report attached hereto and incorporated herein as **COMPLAINT EXHIBIT 9.**

36. Also as part of the documentation in support of her LTD benefits claim, Ms. Novick submits the Letter Report of Dr. Horowitz dated April 6, 2009, in which Dr. Horowitz writes, *inter alia,* that:

On 12/2007 she was rotated to a stronger regimen against Babesiosis, a malarial type organism frequently associated with Chronic Lyme Disease. This was suspected because of the amount of sweats and chills present in a woman having normal menstrual cycles, who was not yet menopausal. Her follow-up visit on 1/14/08.did show some minimal improvements with this regimen, but Ms Novick had difficulty with the regimen because of the

12

severity of Jarish-Herxheimer flares. These are symptomatic increases in baseline symptoms due to the antibiotic therapy, and she has been plagued by extremely severe Herxheimer reactions during the last several years .of therapy. Every time that a new therapy is introduced, she has had difficulty tolerating the side effects .of the treatment as the bacteria are being killed off. There are a significant number .of Chronic Lyme patients who suffer from this problem, and it interferes with effective therapy since the regimens must frequently be decreased .or stopped as the symptoms become intolerable. We tried adding Elavil 10 mg at bedtime and Cymbalta in the morning to help with the frequent awakening at night and neuropathic pain during the day, hoping that these would mitigate the severity of the reactions. Unfortunately, Ms Novick continued to have difficulty with flares despite this regimen, and on 2/29/08 we rotated her regimen from Omnicef and Biaxin to. Doxycycline and levaquin. Again she had difficulty tolerating the regimen, and we decided t. petition for IV Rocephin since she was failing oral regimens. Again, the same problem arose with severe Jarish-Herxheimer flares, and the IV medication was unable to. be continued. We tried rotating her to. a different IV medication (IV doxycycline) on 6/08 before giving up on IV therapy, but she had a poor response with more muscle pain and increased numbers of days in bed sleeping for long periods of time. There were .small improvements in brain fog and neuropathy, but .overall she did not show any sustained clinical improvements even with aggressive IV therapy

Over the next several months. Ms. Novick was tried on other oral regimens. (high dose oral Amoxicillin with Plaquenil, Mepron and Biaxin), and although there again were some small improvements in energy and joint pain, the Herxheimer flares persisted, so she was rotated to intramuscular shots of Bicillin on 9/10/08, with Lariam for the ongoing shaking chills and drenching night sweats. As of 2/26/09, she had been on 5-6 months of Bicillin, Plaquenil and Rifampin. There were 2 good months in November and December, but the Jarish-Herxheimer flares returned in January and required extensive bed rest. As of her last office visit on that date, the fatigue, brain fog, joint pain and neuropathy were her worst symptoms, and she was still functioning at an overall score of 35% of normal. As you can see from Ms Novick's clinical course, although there have been some minor improvements in some areas, she remains disabled with respect to her own occupation, and any occupation. I reviewed the reports by Dr' s Raymond and Lukas, and their conclusions are consistent with my own. Ms Novick is unable to. return to. work. This is based .on the severity of her physical symptoms, with debilitating fatigue, joint pain, nerve pain, and cognitive-dysfunction.

Ms Novick has been a compliant patient, and is clearly motivated to. return to. work. Unfortunately she has failed classical therapies for Chronic Lyme disease, which have included both multiple oral, IM and IV therapies.

> Considering the length .of therapy and different therapies employed, I
> consider her completely disabled in her profession and in any profession
> due to Chronic Lyme disease. Since she has been treated for approximately
> one and .one half years in our medical facility with varying dosages and
> routes of administration of antibiotics and continues to be extremely ill, I
> do. not foresee a significant change in her condition in the near future.

*See* the true and correct copy of Dr. Horowitz's April 6, 2009 Letter Report attached hereto and
incorporated herein as **COMPLAINT EXHIBIT 10**.

37. Pursuant to ERISA's Regulations, 29 CFR – Chapter XXV Part 2560, §2560.503-
1, *et seq.*, defendants are required to render a decision on Ms. Novick's claim for LTD benefits
by no later than the 45th day after receipt of Ms. Novick's application. *See, e.g.*, 29 CFR –
Chapter XXV Part 2560, §2560.503-1(f)(3)("In the case of a claim for disability benefits, the
plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of
the plan's adverse benefit determination within a reasonable period of time, but not later than 45
days after receipt of the claim by the plan").

38. July 11, 2009, a Saturday, is 45 days after defendants' receipt of Ms. Novick's
claim for LTD benefits; July 13, 2009 is the following Monday.

39. At no time prior to July 13, 2009 have defendants requested any extension of time
in which to review and/or act upon Ms. Novick's claim for LTD benefits. *See, e.g.*, 29 CFR –
Chapter XXV Part 2560, §2560.503-1(f)(3)("This period may be extended by the plan for up to
30 days, provided that the plan administrator both determines that such an extension is necessary
due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of
the initial 45-day period, of the circumstances requiring the extension of time and the date by
which the plan expects to render a decision. If, prior to the end of the first 30-day extension
period, the administrator determines that, due to matters beyond the control of the plan, a
decision cannot be rendered within that extension period, the period for making the
determination may be extended for up to an additional 30 days, provided that the plan
administrator notifies the claimant, prior to the expiration of the first 30-day extension period, of
the circumstances requiring the extension and the date as of which the plan expects to render a
decision").

40. At all relevant times herein, defendants have failed to issue a decision on Ms.
Novick's LTD claim in violation of the ERISA regulations, 29 CFR – Chapter XXV Part 2560,
§2560.503-1, *et seq.*

41. Defendants' violation of the ERISA regulations constitutes further evidence of
procedural irregularities and also constitutes a "deemed denial" of Ms. Novick's LTD claim,

entitling Ms. Novick to *De Novo* review. *See, e.g., Burke v. PriceWaterhouseCoopers LLP Long Term Disability Plan*, 2009 U.S. App. LEXIS 15116 at *9-10 (2d Cir. July 9, 2009)("If the plan administrator misses any of the deadlines, the claim is deemed denied   with administrative remedies exhausted thereby permitting a claimant to immediately bring an action in federal court").

42. As a result of the foregoing actions, defendants have breached their obligations and duties under the Plan, including but not limited to their duties as ERISA plan fiduciaries.

43. Ms. Novick has exhausted her administrative remedies under the Plan.

## COUNT I
## VIOLATION OF ERISA PURSUANT TO 29 U.S.C. §1132(A)(1)(B)

44. Plaintiff Ms. Novick incorporates herein by reference paragraphs 1 through 43 of this complaint, inclusive, as though set forth in their entirety.

45. Defendants MetLife and the Plan have improperly terminated Ms. Novick's STD benefits and have improperly denied Ms. Novick's LTD benefits by arbitrarily and capriciously failing to investigate the claim fairly and properly, refusing to apply the terms of the Plan in effect at the time Ms. Novick applied for and was receiving benefits and by violating ERISA, its supporting regulations, Federal common law of ERISA, and New York state statutory and/or common law regulating the construction and interpretation of insurance contracts.

46. As a proximate result of the aforementioned actions of defendants, Ms. Novick has been denied all of the STD and LTD benefits to which she is entitled under the Plan, all in violation of ERISA.

## IV.   **PRAYER FOR RELIEF**

WHEREFORE plaintiff Ms. Novick requests the Court grant judgment in her favor and against defendants and seeks the following relief:

(a)  award plaintiff Ms. Novick all applicable STD and LTD benefits to which she is entitled plus interest;

(b )  award plaintiff Ms. Novick the costs of this litigation and a reasonable attorney fee; and,

(c) such other relief as the Court deems appropriate.

By: Scott M. Riemer

Scott M. Riemer, Esq. (SR5005)
RIEMER & ASSOCIATES, LLC
60 East 42nd Street - Suite 2430
New York, NY 10165
(212) 297-0700 Telephone
(212) 297-0730 Facsimile
sriemer@riemerlawfirm.com

By: Alan H. Casper

Alan H. Casper, Esquire
PA Attorney I.D. #47081
121 S. Broad Street – 20th Floor
Philadelphia, PA 19107
(215) 546-1124 Telephone
(215) 546-1159 Facsimile
acasper@alanhcasperesq.com

Dated: August 3, 2009

# Exhibit 1

⊘ 6ℓ

**MetLife®**
PO Box 14680 Lexington, KY 40512-4680
Phone: 888-294-1994 Fax: (859) 246-1670

July 23, 2007

Karen Novick
500 Mountain Road
Larksville, PA 18651

Claim Number: 590703303563
Policyholder: MetLife

Dear Ms. Novick:

This letter is in regard to your claim for Short-Term Disability benefits. After conducting
a complete review of your file, we have concluded the medical information supplied does
not support your continued eligibility for Short-Term Disability benefits beyond 6/11/07.

According to your plan, "disabled means that, due to sickness, pregnancy or accidental
injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing
basis; and are unable to earn more than 80% of your pre-disability earnings at your own
occupation for any employer in your local economy."

Our records indicate you have not worked full time as of 2/6/07 due to chronic fatigue
and muscle weakness. Your claim was approved from 2/7/07 through 6/8/07.

A Clinical Specialist reviewed an office visit note from Dr. Prater dated 06/27/2007 and a
neurology consult dated 04/17/2007, Dr. Turel. There was no documentation of medical
findings to support a functional impairment that would prevent you from performing the
duties of your occpation from Dr. Prater or Dr. Turel. The exam findings were
essentially negative by both physicians. Both physicians report that you have reported
fatigue, joint pain, joint stiffness as well as symptoms of neuralgia, however, there were
no documented medical findings to support your self reported symptoms. In fact, Dr.
Turel indicated: 'examination actually looked fairly stable. While she had symptoms of
diffuse discomfort of dyesthesia, I could not account for them.' His exam was negative.
Dr. Prater did not provide any exam findings, but indicated the exam findings had not
changed. There were no significant abnormal findings found in any of the medical
documentation provided by Dr. Prater.

For your claim to be considered for benefits beyond 06/08/2007, documentation of
medical findings that support a functional impairment that prevents you from performing
the duties of your occupation, would need to be submitted.

**COMPLAINT EXHIBIT 1**

For claim reconsideration, kindly submit any abnormal findings, office visit notes, referrals or consultations not previously submitted for review.

Because your claim was denied in whole or in part, you may appeal this decision by sending a written request for appeal to MetLife P.O Box 14680 Lexington, KY 40512-4680 within 180 days after you receive this letter. Please include in your appeal letter the reason(s) you believe the claim was improperly denied, and submit the previously requested information as well as any additional comments, documents, records, or other information relating to your claim that you deem appropriate for us to give your appeal proper consideration. Upon request, MetLife will provide you with a copy of the documents, records, or other information we have that are relevant to your claim and identify any medical or vocational expert(s) whose advice was obtained in connection with your claim. MetLife will evaluate all the information and will advise you of our determination of your appeal within 45 days after we receive your written request for appeal. If there are special circumstances requiring additional time to complete our review, we may take up to an additional 45 days, but only after notifying you of the special circumstances in writing. In the event your appeal is denied in whole or in part, you will have the right to bring civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974.

If we can answer any questions regarding your disability claim, please contact the undersigned.

Sincerely,


Allan Boreland
Disability Case Manager

# Exhibit 2

# Richard I. Horowitz, M.D.
## Diplomate, American Board of Internal Medicine

October 10, 2007

Re: Karen Novick, DOB 8/13/1962

To Whom It May Concern:

Ms. Novick was seen on consultation by our office on 9/27/2007 for multiple chronic and debilitating symptoms. She was in her usual state of health until suffering an embedded tick bite on January 6, 2007, and a week later fell ill with symptoms consistent with acute Lyme disease. She is severely impaired by her symptoms which include: chills, sweats, severe fatigue, joint pains which affect her elbows, wrists, hands, fingers, ankles, and knees, stiffness, muscle twitching, significant burning pains in her body, significant brain fog and confusion, difficulty with concentrating and reading, poor memory, and mood swings. Currently she is only functioning at an estimated 35% of normal.

Because of her multiple chronic fibromyalgia-like symptoms, her cognitive impairments, and her severe neuralgia the patient is disabled at this time. She has had an extensive workup through other medical specialties and no other cause of her condition has been identified. She has a panoply of symptoms that are consistent with chronic neurologic Lyme disease and multiple studies in the peer-reviewed medical literature have documented the ability of Lyme disease to persist despite antibiotic therapy. It is our opinion that Ms. Novick is unable to uphold the responsibilities of her job or of any gainful employment at this time, and that her current condition is the result of Lyme disease.

Thank you very much for help with the care of this very ill patient.

Sincerely,

Richard Horowitz, MD

Diplomate, ABIM

Director, HVHAC

President-Elect of ILADS (International Lyme and Associated Disease Society)

**Hudson Valley Healing Arts Center • 4232 Albany Post Road • Hyde Park, New York 12538**
**(845)-229-8977**
**Fax: (845)-229-1208**
**E-mail: HHvhac@aol.com**

COMPLAINT EXHIBIT 2

# Exhibit 3

071119F05776



*Elite Physicians®,
Ltd.*

A Subsidiary of
NMR

*Providers of
Evidence-Based
Medical Reports*

| | |
|---|---|
| **REFERRAL BY:** | Tina Dupree |
| **ADDRESS:** | MetLife Insurance Company |
| | 628 Hebron Ave |
| | Glastonbury CT, 13424 |
| **NAME:** | Karen Novick |
| **CLAIM #:** | 590703303563 |
| **NMR #:** | D91779.01 |
| **JOB:** | Business Systems Analyst |
| **DOB:** | 08/13/62 |
| **EMPLOYER:** | MetLife Group ASA |
| **DIS. DATE:** | 02/07/07 |
| **REF. DATE:** | 11/14/07 |
| **DIAG:** | Lyme disease |
| **VENDOR TX:** | 364041877 |
| **DATE:** | 11/19/2007 |

**RECORDS PROVIDED FOR REVIEW:**

| CLAIM LOG | | 02/06/07-11/12/07 | 1-45 |
|---|---|---|---|
| PROG NOTES | J. Prater, M.D. | 01/03/07-07/31/07 | 46-60 |
| PROG NOTES | Inter Mountain Medical Group | 03/14/07+Undated | 61-65 |
| PROG NOTES | Milton S. Hershey Medical Center College Of Medicine | 04/17/07-06/04/07 | 66-75 |
| PROG NOTES | E. Eskow, M.D. | 08/03/07-09/13/07 | 76-77 |
| PROG NOTES | R. Horowitz, M.D. | 10/10/07 | 78 |
| LAB | | 02/02/07-03/01/07 | 79-83 |
| CT/MRI | | 03/07/07 | 84-85 |
| MISC. | | 02/07/07-10/18/07 +Undated | 86-121 |
| ROI | | 02/12/07-10/16/07 | 122-124 |

605 Fulton Avenue
Suite 2002
Rockford, Illinois 61103

Phone: 815-964-6334
Fax: 815-964-1162

E-Mail:
info@elitephysicians.com

Visit our website
www.nmrco.com


ACCREDITED
PERFORMANCE REVIEW
ORGANIZATION

**TELECONFERENCE:** Teleconference attempted #1 with Dr. Albano-Aluquan on 11/15/07 at 2:45 p.m. EST.  I was able to speak with the office staff.  They informed me that Dr. Aluquan was out of the office until after January 2008.  I contacted the NMR staff.  They requested that I proceed with the review and not perform a teleconference with Dr. Aluquan.

My first attempt at a teleconference with Dr. Horowitz was on 11/15/07 at 2:45 p.m. EST.  Dr. Horowitz's office staff was kind enough to allow me to speak directly with Dr. Horowitz immediately and Dr. Horowitz was extremely helpful and forthcoming in describing his experience in evaluating Ms. Novick.  He reviewed her medical records and undertook an extensive discussion for greater than 15 minutes describing the immunology of chronic Lyme disease.  It was his thinking that she probably had Lyme's disease with a prolonged neurological manifestation.  He noted an extensive

**COMPLAINT EXHIBIT 3**

array of clinical data and clinical trial data as well as published information in regard to this diagnosis and the current thinking on the pathophysiology of the process. He did not describe specific objective clinical findings with respect to Ms. Novick's physical examination in regard to limitation that she had as result of this condition.

ASSESSMENT: Karen Novick has a history of Lyme disease that reportedly had an onset following a tick bite that occurred in January 2007. Apparently, following the bite, she began to develop febrile process with diffuse myalgias and arthralgias. This is associated with subjective weakness, severe fatigue, and multiple cognitive complaints including difficulty concentrating, thinking and being confused. She also has described multiple widespread migratory dysesthesias in both the upper and lower extremities as well as multiple myalgias and arthralgias in a migratory distribution. The symptoms have persisted throughout time and have continued throughout the historical data reviewed. She has a history of diabetes as well as hypertension. She was involved in a motor vehicle accident in August of 2006 with no apparent long-term sequela that resulted from this. There has also been a diagnosis of fibromyalgia given the sum of her medical provider's in the past. She has seen at least one neurologist and perhaps two and after a full evaluation, neither neurologist consultant felt that she had multiple sclerosis. There are no historical features of cardiac, pulmonary, gastrointestinal, or neurological problems that would be expected to be producing restrictions or limitations on activities.

Workup data I have available include an MRI of the cervical spine, which was essentially revealing only a modest degenerative change. She had an MRI of the brain in March of this year, which revealed a few nonspecific foci in the subcortical white matter. These were not felt to be demyelinating lesions. A lumbar puncture was reportedly normal. On spot urine test, she had a positive arsenic level but a 24-hour urine collection revealed this to be a false positive. EBV serology revealed an old infection. She has had negative toxoplasmosis titers and negative CMD titers. Blood cultures were negative. Thyroid function studies were normal. Rheumatoid factor was negative. An ESR and CRP were normal, as was a CBC and chemistry profile. She had an extensive array of Lyme studies and other antibody studies for several other organisms. Dr. Horowitz informed me of these and stated that the majority of them were negative. He felt her Western Blot Lyme serology was somewhat equivocal in that one of the unusual bands was positive although the summation test was reported to be negative by CDC criteria.

Examination data reported in the medical records is exceedingly sparse. There is little in the way of objective findings that would be expected to be producing restrictions or limitations on activities. There is mention of tender points on at least one evaluation. No synovitis is noted. No extraarticular manifestations are described or mentioned in any of the examinations that would be expected to be producing restrictions or limitations on activities.

Treatment data includes utilization of antibiotics that were given shortly after the initial onset process. She also has been on antidepressants, muscle relaxants, and analgesics. Other agents mentioned included trial of gabapentin.

**071119F05776**

RE: Karen Novick                                          NMR#: D91779.01
Page 3



## IN ANSWER TO YOUR SPECIFIC QUESTIONS:

1. **Does the medical information support functional limitations (physical or psychiatric) beyond 06/08/07? Functional limitations include any reduction in the ability to work full time.**

No. The objective medical record data do not support any objective findings that would be expected to be producing restrictions or limitations on activities.

2. **If yes, please specify the types of limitations the claimant would have. Describe the specific, clinical findings/data noted in the records in support of functional limitations. Please list each document referred to above including provider's name, specialty, date of visit and clinical findings.**

Not applicable.

3. **If no, please describe using above format.**

Following a careful and thorough review of all the medical record data, there are no objective findings in the medical records that would necessitate the placement of restrictions or limitations on activities. Although she may in fact have a manifestation of chronic CNS Lyme disease, there are no findings that would lead this reviewer to state that this process is producing any degree of an inability to work. Therefore, Ms. Novick is capable of unrestricted work.

## CONFLICT OF INTEREST ATTESTATION:

I attest to the fact that there is no conflict of interest with this review for referring entity, benefit plan, enrollee/consumer, attending provider, facility, drug, device, or procedure.

I attest that my compensation is not dependent on the specific outcome of my review.

## PHYSICIAN ADVISOR:

D. Dennis Payne, Jr., M.D.
Board Certified Internal Medicine
Board Certified Rheumatology
Licensed in State of NC # 35459

*NMR CONFLICT OF INTEREST ATTESTATION:*

*NMR attests to the fact that there is no conflict of interest with this review for referring entity, benefit plan, enrollee/consumer, attending provider, facility, drug, device or procedure. NMR attests that its compensation is not dependent on the specific outcome of this review or has had any involvement with this case prior to this referral.*

# Exhibit 4

# Richard I. Horowitz, M.D.
**Diplomate, American Board of Internal Medicine**

January 11, 2008

Re: Karen Novick, DOB 8/13/1962
Claim Number 590703303563
SSN: 198 -- 56 -- 3877

**To: MetLife Disability**

### Expert report on disability and review of case

At the request of our patient, Ms. Novick, and her attorney, Mr. Paul Jennings, we have spent extensive time reviewing the records and history of her medical case. Additionally, we have also reviewed the patient's narrative history declaration/affidavit regarding her symptoms and the extent to which they disabled her. We find that both the patient's declaration and the summary letter from her attorney are accurate. The patient's self-described symptoms are consistent with what has been described throughout her medical records and during the time that she has been our patient. The symptoms are consistent not only with well documented illnesses such as chronic fatigue syndrome and fibromyalgia but are strongly consistent with the effects of neurologic Lyme disease. As clearly documented in our office notes and in appeal letters which were provided by our practice on behalf of the patient on October 10, 2007 and December 1, 2007, she is clearly disabled by her panoply of symptoms.

It is our understanding that at this point Ms. Novick has been denied disability and that the reasons given for this decision are that there is a lack of objective findings to support that she is ill, and that her condition has not been demonstrated to be disabling. We disagree strongly with this denial as it does not reflect a thorough review of her medical records and the known medical literature regarding Lyme disease. Additionally, we feel that this decision does not reflect the fact that Ms. Novick has tested positive for elevated levels of the toxic metals lead and mercury—something that is associated with neurologic disorders and other chronic health problems. To more fully illustrate the reasons for our conclusion that she is indeed disabled and that her symptoms are consistent with neurologic Lyme disease as well as with the conditions of fibromyalgia and chronic fatigue syndrome we have submitted to her attorney a significant body of medical literature reviewing many crucial points regarding Lyme disease as it pertains both to issues of diagnostic testing and to patient evaluation and

**Hudson Valley Healing Arts Center • 4232 Albany Post Road • Hyde Park, New York 12538**
**(845)-229-8977**
**Fax: (845)-229-1208**
**E-mail: HHvhac@aol.com**

# Richard I. Horowitz, M.D.
**Diplomate, American Board of Internal Medicine**

treatment. Because the amount of material submitted is quite lengthy we have also elected to summarize her case with some of the most relevant medical literature as described below.

Ms. Novick is a 45-year-old woman who was in her usual good state of health until receiving an embedded tick bite on January 6, 2007. As noted in our initial consultation history and physical the tick was on her for an estimated 6 hours or longer—a more than adequate length of time for her to be infected with Lyme disease. The patient was started immediately on doxycycline as antibiotic prophylaxis but despite this intervention she fell ill both abruptly and severely with intense flu-like symptoms approximately one week later. She worsened over the next two weeks and became so ill that she had to be hospitalized. She has had extensive evaluations by specialists in the fields of both Neurology and Infectious Disease but explanations that would account for her illness other than Lyme disease have not been found.

Although Ms. Novick has not had testing for Lyme disease that would meet CDC criteria for being positive there are a number of factors that must be kept in mind when reviewing her test results and history. First, her Lyme western blots have shown a positive 23 band and this is extremely specific for exposure to Borrelia. As noted in the article by Ma et al., Serodiagnosis of Lyme Borreliosis by Western immunoblot: reactivity of various significant antibodies against Borrelia *burgdorferi* (Journal of Clinical Microbiology 1992; 30: 370-76), this represents reactivity to the Osp. C antigen on the bacterium which causes Lyme disease and is a strong clinical marker for the presence of this pathogen. This finding would not be positive if the patient had not been exposed to Borrelia *burgdorferi*. Additionally, the banding on her western blots has tended to expand over time and this is also supportive of a diagnosis of Lyme disease. Second, it is also well-established that the early use of antibiotics can result in an abrogation of the immune response to Borrelia and thus may decrease the chances of a positive test for this disease (Shrestha, M, Grodzuk, RI, Steere, AC: Diagnosing Early Lyme disease. American Journal of Medicine, 1985; 78:235-240). It is also important to note that the patient has had on her IgM Western blot a weakly active 41 band in conjunction with a positive 23 band: if the 41 band had been slightly stronger (and she did have a strongly positive 41 band on her IgG Western blot) she would have met CDC criteria for having a positive Lyme disease Western blot. Third, it is also crucial to point out that although it has been argued that a positive ELISA as well as a positive Western blot would be required for a true serologic diagnosis of Lyme disease this is a very dangerous misconception. As noted in a letter from the New York State Department of Health to Dr. Curtis Fritz on April 15, 1996 (copy included with documentation for review) this two-tiered system would result in 81% of non-erythema migrans Lyme disease cases being misdiagnosed as negative. Additionally, it must be remembered that the

**Hudson Valley Healing Arts Center • 4232 Albany Post Road • Hyde Park, New York 12538**
**(845)-229-8977**
**Fax: (845)-229-1208**
**E-mail: HHvhac@aol.com**

# Richard I. Horowitz, M.D.

**Diplomate, American Board of Internal Medicine**

proposed two-tiered diagnostic system was intended <u>only</u> for a large-scale epidemiologic surveillance and not for the clinical diagnosis and treatment of Lyme disease.

It is well documented that patients who struggle with chronic illness from Lyme disease often present with a clinical picture that reflects significantly high symptomatic impairment (often with symptoms such as fatigue, cognitive difficulties, joint and muscle pains), but the physical findings on examination can be unimpressive. Ms. Novick classically fits this picture. She suffers with chills, sweats, severe and disabling fatigue, joint pains, stiffness, muscle twitching, burning pains/neuralgia and electrical sensations throughout her body that incapacitate her, disabling lightheadedness and poor balance, a host of severe and disabling cognitive problems including brain fog, confusion, difficulty thinking, difficulty with concentrating and reading, and poor memory, and an excessive and disabling need for sleep. All of these are consistent with the application of the Americans with Disabilities Act. We have advocated that the patient should undergo complete neuropsychological testing not only to document the extent of her neurocognitive impairments but also to identify ways in which neurocognitive rehabilitation therapies could help her. Because the management of Lyme disease differs significantly from that of other traumatic brain injuries we feel very strongly that she should be seen by someone who is well versed in the testing and treatment of these patients. Our recommendation has been that she should be evaluated by Dr. Leo Shea at New York University but her insurance has refused this referral.

Although the patient has shown some improvement with antimicrobial therapy she remains severely symptomatic and is still disabled. From our experience in having evaluated and cared for her over the past several months it is our belief that she wants to get well and resume her career. There are no signs that she is a malingerer or someone who is suffering from a purely psychiatric illness. There has certainly been controversy in the medical community over the use of long-term antibiotic therapy but more than 43 studies published in the peer reviewed medical literature have demonstrated the ability of Borrelia to persist in the body and this has been well documented even in patients who have received aggressive antibiotic treatment. In particular to this it was recently demonstrated by Livengood and Gilmore (Invasion of human neuronal and glial cells by an infectious strain of Borrelia *burgdorferi*, Microbes and Infection (2006)) that Lyme disease has the ability to invade human nerve cells by localizing themselves in the intracellular environment. Their conclusion is that this finding "provides a putative mechanism for the organism to avoid the host immune response while potentially causing functional damage to the neural cells during infection of the central nervous system." Additionally, multiple other studies have demonstrated the ability of Borrelia to sequester itself in sites which significantly decrease

**Hudson Valley Healing Arts Center • 4232 Albany Post Road • Hyde Park, New York 12538**
**(845)-229-8977**
**Fax: (845)-229-1208**
**E-mail: HHvhac@aol.com**

# Richard I. Horowitz, M.D.
**Diplomate, American Board of Internal Medicine**

the ability of the immune system to destroy it. It should also be emphasized that our testing showed elevated levels of lead and mercury and the negative effects of these toxic metals on the health of the body is well documented. A recent study also suggests that in the mouse model toxic metals may significantly inhibit the ability of the immune system to clear Borrelia infection.

In summary, it is our opinion within a reasonable degree of medical certainty that Ms. Novick is disabled by her current symptoms and is not capable of returning to her previous job. We feel that as defined by the Americans with Disabilities Act she clearly meets the criteria for being designated as disabled. Her impairments can easily be expected to persist for another year or longer and the prognosis for significant recovery is guarded at this point. We understand clearly that there is significant controversy in the medical community regarding Lyme disease, but it must be emphasized that whether the diagnosis used is chronic fatigue syndrome, fibromyalgia, or chronic neurologic Lyme disease, the significance of her symptoms and the terrible impact that they have had on her life must not be overlooked. Her disability should not be dependent upon a particular name for a disorder but rather should be based upon her clinical picture and in this regard her medical records show a strongly consistent presentation with multiple disabling symptoms.

Thank you very much for your time and attention to the needs of this very ill patient.

Sincerely,

Richard Horowitz, MD
Diplomate, ABIM
Director, HVHAC
Vice-President of ILADS (International Lyme and Associated Disease Society)

John Fallon FNP

**Hudson Valley Healing Arts Center** • 4232 Albany Post Road • Hyde Park, New York 12538
(845)-229-8977
Fax: (845)-229-1208
E-mail: HHvhac@aol.com

# Exhibit 5

# 080208F09231



*Elite Physicians®, Ltd.*

*A Subsidiary of*
NMR

*Providers of*
*Evidence-Based*
*Medical Reports*

| REFERRAL BY: | Tina Dupree |
|---|---|
| ADDRESS: | MetLife Insurance Company (02E-315A) |
| | 1300 Hall Boulevard |
| | Bloomfield, CT 06002-4586 |
| NAME: | Karen Novick |
| CLAIM #: | 590703303563 |
| NMR #: | D91779.02 |
| JOB: | Business Systems Analyst |
| DOB: | 08/13/62 |
| EMPLOYER: | MetLife Group ASA |
| DIS. DATE: | 02/07/07 |
| REF. DATE: | 11/14/07 |
| DIAG: | Lyme disease |
| VENDOR TX: | 364041877 |
| DATE: | 02/8/08 |

## RECORDS PROVIDED FOR REVIEW:

| Additional Info | | | 1-52 |
|---|---|---|---|

**ASSESSMENT:** Karen Novick is a female who carries the diagnosis of possible chronic Lyme disease. The case has been fully reviewed by me in the past as was complete adjudication of the file; please see my report dated 11/19/07. Additional information has become available of late and I have been asked to review this information taking into account the previous medical records submitted and to provide further opinions regarding Ms. Novick's functionality.

The information I have includes a progress note from 9/27/07 from the office of Dr. Richard Horowitz and a nurse practitioner John Fallon. There is a checklist of symptomatology and it is contained in the records. In addition, there is other history and examination information that is entirely consistent with the previously submitted data. There are no additional examination findings described. I see an additional letter dated 12/01/07 from Dr. Horowitz, in which he provides an opinion that Ms. Novick is disabled as a result of the symptoms that are reported to be related to Lyme disease and fibromyalgia. He recommends obtaining a SPECT scan as well as neuropsychological testing to better evaluate her functionality. There is no new examination finding in any other submitted records. There is no additional laboratory data although I do see recommendation for a Babesia serological test as well as a recheck of her arsenic level, which I believe to be normal.

In reviewing the medical records, the information is essentially consistent with all of the previously submitted data with multiple somatic symptoms and multiple subjective features with no objective information being noted.

*605 Fulton Avenue*
*Suite 2002*
*Rockford, Illinois 61103*

*Phone: 815-964-6334*
*Fax: 815-964-1162*

*E-Mail:*
*info@elitephysicians.com*

*Visit our website*
*www.nmrca.com*

## COMPLAINT EXHIBIT 5

**0802U8F09231**

RE: Karen Novick                                                                NMR#: D91779.02
Page 2



## IN ANSWER TO YOUR SPECIFIC QUESTIONS:

### 1. Does the additional information change your previous opinion? Please explain.

No.  Following a review of the additional data as noted above, there is only a reiteration of multiple somatic complaints and subjective symptoms.  There is no objective basis in any of the examinations or workup data.  The question of whether or not Ms. Novick has Lyme disease, in the opinion of this reviewer, is not the issue.  The question here is whether there are any objective findings in any of this medical record data that would necessitate the placement of restrictions and limitations on activity.  In my review of the additional medical information, there is again no objective findings that would necessitate the placement of restrictions and limitations on activities whether it be related to fibromyalgia and/or Lyme disease or some other rheumatic condition.   Therefore, from a rheumatology viewpoint, my opinion is unchanged that she is capable of unrestricted work.

**CONFLICT OF INTEREST ATTESTATION:**  I attest to the fact that there is no conflict of interest with this review for referring entity, benefit plan, enrollee/consumer, attending provider, facility, drug, device, or procedure.

I attest that my compensation is not dependent on the specific outcome of my review.

**PHYSICIAN ADVISOR:**

D. Dennis Payne, Jr., M.D.
Board Certified Internal Medicine
Board Certified Rheumatology
Licensed in State of NC # 35459

*NMR CONFLICT OF INTEREST ATTESTATION:*

*NMR attests to the fact that there is no conflict of interest with this review for referring entity, benefit plan, enrollee/consumer, attending provider, facility, drug, device or procedure. NMR attests that its compensation is not dependent on the specific outcome of this review or has had any involvement with this case prior to this referral.*

# Exhibit 6

$\mathcal{OGC}$



**MetLife**®

P O Box 14590
Lexington, KY 40511-4590
Fax: 800-230-9531

February 12, 2008

Paul Jennings, Esq.
Employment Law Office
321 Spruce St., Bank Towers, Ste 1202
Scranton, PA 18503

R/E: Karen Novick
Claim #: 590703303563
Employer: Metlife

Dear Mr. Jennings:

We have completed our review of the termination of Ms. Novick's claim for disability benefits beyond June 8, 2007. The previous determination was upheld upon appeal review for the following reasons:

Her employer's plan states the following: "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, (she):

1. (is) receiving appropriate care and treatment from a doctor on a continuing basis, and
2. (is) unable to earn more than 80% of your predisability earnings at (her) own occupation for any employer in (her) local economy

We reviewed her complete claim. All medical information in the claim file has also been reviewed by an Independent Physician Consultant, Board Certified in Rheumatology and Internal Medicine.

Ms. Novick went out of work on February 7, 2007 due to Lyme disease. Benefits were approved through June 8, 2007, and then subsequently terminated due to medical not supporting disability under the Plan.

Ms. Novick's cervical spine MRI revealed modest degenerative change. An MRI of the brain in March 2007 revealed a few nonspecific foci in the subcortical white matter. A lumbar puncture was reported to be normal. Most of the lab work in the file was reported to be within normal limits. Dr. Horowitz reported that Ms. Novick's Western Blot Lyme serology was positive due to one of the unusual bands being positive, although the summation test was reported to be negative by CDC criteria. The examinations on file indicated tender points on evaluation. No synovitis or extra-articular manifestation were noted in the examinations. Ms. Novick was treated with medications for her condition.

According to the independent physician who reviewed Ms. Novick's claim, the medical information on file does not validate functional limitations. The consultant does not disagree that Ms. Novick may have chronic Lyme disease. However, the consultant concludes that there are no clinical findings that would evidence restrictions and limitations on Ms. Novick's activities.

**COMPLAINT EXHIBIT 6**

While we do not dispute Ms. Novick's diagnosis, the available information does not demonstrate that she was unable to perform the essential duties of her occupation as a business systems analyst as of June 9, 2007. Therefore, she does not satisfy the plan's definition of disability. As such, the previous claim determination was appropriate, and remains in effect.

Upon request, MetLife will provide you with a copy of the documents, records, or other information that are relevant to your claim and identify any medical or vocational expert(s) whose advice was obtained in connection with your claim. You also have the right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974.

You have exhausted your administrative remedies under the plan, therefore no further appeals will be considered.

Sincerely,


Eric Kelly
Appeals Specialist
Metropolitan Life Insurance Company

# Exhibit 7

May 26, 2009

MetLife Disability
Plan Administrator-Long Term Disability Plan
C/o
ECS 2025 Leestown Road  Suite E2
Lexington Kentucky, 40511

              Re:    **Application for Long Term Disability Benefits**
                       Plan Participant/Insured:  Karen Novick
                       Employer:  Metropolitan Life Insurance Company
                       ERISA Plan:  Welfare Plan for Employees of Metropolitan Life
                                     And Participating Affiliates, Plan No. 511
                       Prior Short Term Disability Claim No. 590703303563

Dear Sir/Madam:

        Pursuant to the mailing instructions provided by MetLife Customer
Service Representative, Alisa, on May 26, 2009, please find enclosed my application for
Long Term Disability benefits under the Welfare Plan for Employees of Metropolitan
Life and Participating Affiliates, Plan No. 511.  Also included are supporting reports and
other documents.  MetLife is well familiar with my illness and disability, having already
received timely notice and extensive documentation regarding both as part of my claim
for Short Term Disability benefits under the MetLife Options and Choices Plan 512.

               The following documents are enclosed:

- My Completed Employee Statement;

- My Completed Personal Profile, together with Medication Spreadsheet;

- My Completed Reimbursement Agreement;

- My Completed Authorization for Disclosure of Information;

- My Completed Social Security Authorization;

- Attending Physician Narrative Report(Dr. Richard Horowitz) dated April 6, 2009, together with his Completed Attending Physician Claim Form dated September 11, 2008;

- Dr. Richard Horowitz's Curriculum Vitae;

COMPLAINT EXHIBIT 7

- Dr. Mark Lukas Occupational Evaluation dated February 11, 2009;

- Dr. Mark Lukas Curriculum Vitae;

- Dr. Michael Raymond Neurological Consultation Report dated August 25, 2008;

- Dr. Michael Raymond Biographical Information;

- Karen Novick Resume;

- Monsignor Sempa's Letter dated May 20, 2009 regarding his observations of my functionality; and,

- Medical Records of Dr. Richard Horowitz, current through my last office visit of May 21, 2009.

I respectfully request that you review my application for benefits in a prompt and timely manner, and report back to me on your decision. I would also ask that you provide me with copies of all new and additional documentation and information developed or generated by MetLife with respect to my application for benefits. Should you have any questions, please do not hesitate to contact me in writing. I will endeavor to provide you promptly with any additional information you may require.

Thanking you for your time and attention in this matter, I am

Very truly yours,

Karen Novick

Postal Connections
Tuft-Tex Complex
1325 River St. Suite 100
Plains, PA 18702
Phone 570-824-2099
Fax 570-824-2895

*****************************************

Shipment------------------------
  FedEx Standard Overnight
  Ship To:
      C/O ECS
      METLIFE DISABILITY
      2025 LEESTOWN ROAD
      SUITE E2
      LEXINGTON; KY 40511
  Package                              37.72
  Tracking #:  799419031470
  Expected arrival: Wed 05/27 03:00 PM
  Declared value: $100.00
Greeting Card                         2.50 TX

  SUBTOTAL                            40.22
  TAX
  State Tax on 2.50                    0.15
  TOTAL                               40.37
TEND Visa                             40.37

KARNE NOVICK
                                  05/26/2009
#11176                             02:23 PM

*****************************************
Thank you for shipping with us.
TAKE $1.00 OFF YOUR NEXT SHIPMENT
*****************************************
NO LONGER HONOR TXIL GUARANTEES!!

```
              570-823-1201
        POSTAL CONNECTIONS #181
         1325 RIVER RD STE 100
           PLAINS,  PA 18702

TERMINAL I.D.:                    0507
MERCHANT #:                       25155


VISA                      ITEM #: 004
**************1468
SWIPE
SALE

   DATE: MAY 26, 2009  TIME: 14:23
                    AUTH NO: 087082



   TOTAL            $40.37
```



**FedEx**

Español | Customer Support | FedEx Locations   Search [ ] **Go**

| Package/Envelope | Freight | Expedited | Office/Print Services ✳ |

Ship ▸   Track ▸   Manage ▸   Business Solutions ▸

## Detailed Results

Printable Version   Help

Enter tracking number [ ]

| Detailed Results | Notifications |

**Tracking no.: 799419031470**   ✉ E-mail notifications

**Delivered**   Initiated   Picked up   In transit   Delivered

**Delivered**
Signed for by: L.MCCOY

**Shipment Dates**

Ship date ⑦ May 26, 2009
Delivery date ⑦ May 27, 2009 10:24 AM

**Destination**

LEXINGTON, KY
Signature Proof of Delivery ⑦

### Shipment Facts   Help

| Service type | Standard Pak | Delivered to | Shipping/Receiving |
| Weight | 3.0 lbs/1.4 kg | Reference | (PCS)NOVICK |

### Shipment Travel History   Help

Select time zone: Select

Select time format: 12H | 24H

All shipment travel activity is displayed in local time for the location

| Date/Time | Activity | Location | Details |
|---|---|---|---|
| May 27, 2009 10:24 AM | Delivered | LEXINGTON, KY | |
| May 27, 2009 9:11 AM | On FedEx vehicle for delivery | LEXINGTON, KY | |
| May 27, 2009 7:57 AM | At local FedEx facility | LEXINGTON, KY | |
| May 27, 2009 5:35 AM | Departed FedEx location | INDIANAPOLIS, IN | |
| May 26, 2009 7:51 PM | Left FedEx origin facility | PITTSTON, PA | |
| May 26, 2009 5:54 PM | Picked up | PITTSTON, PA | |
| May 26, 2009 1:22 PM | Shipment information sent to FedEx | | |

Global Home | FedEx Mobile | Service Info | About FedEx | Investor Relations | Careers | fedex.com Terms of Use | Privacy Policy | Site Map |
This site is protected by copyright and trademark laws under US and International law. All rights reserved.© 1995-2009 FedEx

# Exhibit 8

THIS INFORMATION HAS BEEN DISCLOSED TO
YOU FROM RECORDS WHOSE
CONFIDENTIALITY IS PROTECTED BY STATE
STATUE. STATE REGULATIONS LIMIT YOUR
RIGHT TO MAKE ANY FURTHER DISCLOSURE
OF THIS INFORMATION WITHOUT THE PRIOR
WRITTEN CONSENT OF THE PERSON TO
WHOM IT PERTAINS.

# ALLIED SERVICES

### John Heinz Institute of Rehabilitation Medicine

150 Mundy Street • Wilkes-Barre Township, PA 18702
(570) 826-3800 • TDD (570) 826-3789

**CONFIDENTIAL**

NOVICK, KAREN
PRATER, JOHN
500 MOUNTAIN ROAD
LARKSVILLE
HMO NEPA

3/3/2008

## NEUROPSYCHOLOGICAL CONSULTATION

**NAME:** Novick, Karen

**ADDRESS:** 500 Mountain Road
Larksville, PA 18651

**TELEPHONE:** (570) 779-5503

**PATIENT NUMBER:** 698659

**LATERAL DOMINANCE:** Left

**GENDER:** Female

**REFERRED BY:** John Prater, M.D.

**DATE OF EVALUATION:** 4/08; 8/08

**DATE OF BIRTH:** 8/13/62

**AGE:** 45

**MARITAL STATUS:** Married

**EDUCATION:** 14 (Associates Degree)

**OCCUPATION:** Disabled (Social Security
Disability Pending)

**REFERRED FOR:** Assessment of Current Neuropsychological Status

**DIAGNOSIS:** Autoimmune Encephalopathy secondary to Lyme Disease; by history

**MEDICATIONS:** Plaquenil, 200 mg bid, Levaquin, 500 mg daily, Doxycycline, 200 mg bid,
Nystatin, 500,000 bid, Amitriptyline, 10 mg hs, Cymbalta, 30 mg daily,
Neurontin, 200 mg tid, Malarone, 250 daily, Methylcobalamin, 25 mg daily

MENTAL STATUS:

**ORIENTATION:** Fluctuating (date)

**ATTENTION/CONCENTRATION:** Fluctuating

**MOOD:** Depressed, Frustrated

**THOUGHT PROCESSES:** Coherent, Somatic Preoccupation

**WORD FINDING:** Mild Hesitancy

*2ONPA*

HNPSY229

**COMPLAINT EXHIBIT 8**



0-
NOVICK, KAREN                    WF 045Y
PRATER, JOHN                     97294
500 MOUNTAIN ROAD                08/13/1962
LARKSVILLE                       PA 18551
HMO NEPA                         YZH1013700900Z

NEUROPSYCHOLOGICAL CONSULTATION
NOVICK, KAREN
PAGE 2

3/3/2008                                          ( 698659

### REASON FOR REFERRAL:

Ms. Novick is a 45 year old, Caucasian, married, left-handed female with an Associates Degree in Criminal Justice.  Reportedly, she was in her general state of good health until 1/13/07.  At that time, she developed "flu-like" symptoms manifested by chills, joint pain, generalized fatigue, and hypersomnia.  Approximately 2 weeks later, her symptoms worsened and she was admitted to Wilkes-Barre General Hospital, Wilkes-Barre, PA for evaluation.  Apparently, she was placed on IV antibiotics and treated accordingly.  She was eventually seen at the Medical Center and underwent cerebral spinal fluid (CSF) testing which apparently was negative.  She was evaluated by a rheumatologist to consider the diagnosis of fibromyalgia.  She was eventually referred to Dr. Horowitz, an internist in Hyde Park, NY.  She was diagnosed with Lyme disease with clinical babesiosis and elevated heavy metals.  Her testing for the Babesia was negative, however, it is indicated that there are a number of pathogen strains that present as false negatives.  Despite this, her clinical symptoms, including cognitive alterations, were consistent with Lyme disease.  Based on this information, she was referred to the undersigned for neuropsychological consultation to establish a baseline of neuropsychological functions and aid in developing additional diagnostic impressions and treatment recommendations.  As an aside, the neuropsychological test results must be viewed cautiously as 50% of her tests were completed in April, 2008 and the second 50% in August, 2008.  Ms. Novick was unable/incapable of completing her evaluation following her initial April, 2008 testing as a result of ongoing medical complications and associated treatment.  Thus, the current results may not accurately reflect her current adaptive abilities.

### PERTINENT MEDICAL/BACKGROUND HISTORY:

As noted above, Ms. Novick has reported a plethora of physical, cognitive, and behavioral alterations associated with chronic fatigue, pain, and other symptoms associated with a possible autoimmune disease (i.e., Lyme disease).  As previously noted, these symptoms began on 1/13/07 following a tick bite.  Her symptoms were "flu-like" and manifested with chills, joint pain, fatigue, and hypersomnia.  Two weeks later she was hospitalized at Wilkes-Barre General Hospital and place on IV antibiotics.  She was seen in neurological and rheumatologic consultation.  At one point it was considered that she had fibromyalgia as her CSF studies were negative.  She eventually was seen per Dr. Horowitz in September, 2007.  She has been treated with various medications as well as vitamin supplements.  In April, 2007, she apparently underwent a cerebral MRI which identified questionable small white matter lesions.  A PET scan (November, 2007) was negative for hyperperfusion.

Ms. Novick continues to be followed medically per her primary care physician, Dr. Prater as well as Dr. Horowitz, internist, who specializes in Lyme disease.  She was referred to the undersigned for neuropsychological evaluation.



NOVICK, KAREN                    WF 045Y
PRATER, JOHN                      97294
500 MOUNTAIN ROAD                 08/13/1962
LARKSVILLE                        PA 18851
HMO NEPA                          YZH10137009002

3/3/2008                          ( 698659 )

NEUROPSYCHOLOGICAL CONSULTATION
NOVICK, KAREN
PAGE 3

Currently, at approximately 16 months post symptom onset, Ms. Novick continues to report a plethora of symptoms. She was initially seen per the undersigned on 4/4/08. As previously indicated, she completed approximately 50% of her evaluation at that time and the second 50% in August, 2008, as a result of increased and somewhat debilitating symptoms. In any event, when she was initially seen, she reported physical symptoms including chronic and debilitating fatigue, chills, sweats, temperature sensitivity, photophobia/sonophobia, joint pain, and transient imbalance. She indicated that her "flare ups" are extremely painful and result in a burning pain through the extremities with associated paresthesias. From a cognitive perspective, she reported fluctuating attention and concentration as well as problems with present memory, word finding, reading comprehension, and executive functions (i.e., organizing, planning, insight). She indicated that she has difficulty recalling what medication she needs to take, information during general conversation, or telephone messages. On occasion she indicated that she becomes confused and lost while driving. She left the burner and coffee machine on. Behaviorally, she remains somewhat depressed, frustrated, anxious, and irritable. She reported mood swings and hyperemotionality. Unfortunately, the above noted symptoms fluctuate and are contingent upon her physical symptoms including pain and fatigue.

Past medical history included the usual childhood illnesses, seasonal and mold allergies, 2 mild concussions while in high school without neurological sequela, and status-post right bunionectomy. There was no history of hypertension, cardiac disease, cerebrovascular disease, diabetes mellitus, cancer, seizure disorder, thyroid disease, major surgeries, neurotoxin exposure, or previous traumatic brain injury. Family history is noteworthy for hypertension and cerebrovascular disease.

Ms. Novick denied past psychiatric history or familial psychiatric disorders. She denied the usage of tobacco, alcohol, illicit drugs, or caffeinated beverages. She denied past military or legal history.

Educationally, Ms. Novick indicated that she received an Associates Degree in Criminal Justice from Luzerne County Community College (LCCC), Nanticoke, PA in 1984. She indicated that she graduated with a 3.2 cumulative grade point average. She also took additional business courses at College Misericordia. She graduated from Bishop Hoban High School in 1980 with a 3.0 cumulative grade point average while completing an academic curriculum. She indicated that her favorite subjects were English and science while her least favorite was history. There was no history of learning disabilities or developmental delays. Both of her parents are high school graduates. Her premorbid level of intellectual functioning was estimated to be within the average range.

Ms. Novick was last employed in February, 2007. At that time, she was employed by MetLife as a system analyst for 2 years. Initially, she received short term disability although her long term disability through MetLife was denied. She is currently in the appeal process to obtain Social Security Disability benefits. Her overall goal is to return to

0-
NOVICK, KAREN                    WF 045Y
PRATER, JOHN                     97294
600 MOUNTAIN ROAD                08/13/1962
LARKSVILLE                       PA 18651
HMO NEPA                         YZH10137009002

NEUROPSYCHOLOGICAL CONSULTATION
NOVICK, KAREN
PAGE 4                                                    3/3/2008              ( 698859 )

work if "I become physically and mentally ready". Her husband is employed by MetLife as
a manager of production support.

Ms. Novick resides with her husband of 6 years in a single family home in Larksville, PA.
They have no children. Her parents are alive and well. She is the youngest child in a
sibship of 3 (one sister, one brother). Unfortunately, her 52 year old brother recently
succumbed to hepatic disease. She denied familial discord and indicated that her
extended family is mutually supportive. She is currently experiencing excessive stress
including her general health, financial concerns, vocational future, and brother's recent
death.

The undersigned reserves the right to supplement this report if additional pertinent
records become available for review.

## BEHAVIORAL OBSERVATIONS:

Ms. Novick was accompanied by her husband (Brian) throughout the initial interview with
the undersigned on 4/4/08. At that time, she presented in a generally pleasant and
cooperative fashion and in no acute distress. A clinical rapport was easily established.
Speech was intelligible and there was no evidence of aphasia or dysarthria. She was well
versed in Lyme disease and neurotoxicity. A mild horizontal nystagmus was noted. Eye
contact was generally sustained. Gait, station, and tandem walking were grossly intact.
Romberg was positive. On 8/6/08, Ms. Novick returned for completion of her
neuropsychological evaluation. She had not been seen per the undersigned for 4
months. During the interim, she indicated "I've been really sick". She continues to be
followed per Dr. Horowitz and at that time, complained of severe joint pain and fatigue.
She indicated that she lost approximately 15 pounds over the past few months.
Furthermore, she indicated that she was frustrated and depressed.

As noted above, mood was depressed and frustrated while affect was appropriate for
mood (blunted). She reported neurovegetative depressive symptoms including
hypersomnia, generalized fatigue, recent weight loss, dysphoria, crying, diminished libido,
and reduced interest. She denied suicidal ideation/intent. Thought processes were
coherent and there was no evidence of formal thought disorder or psychosis. No unusual
perceptions were noted; she denied olfactory/gustatory alterations. Thought focus was
on her multiple life stressors, primarily involving her general health. Orientation at the
time of this examination was disoriented to date.

Ms. Novick understood the purpose of this comprehensive neuropsychological evaluation.
She completed the majority of tasks in a cooperative and well motivated fashion.
However, she abandoned the TPT after the first trial secondary to frustration and fatigue.
Problem solving abilities were reduced, especially on tasks contingent upon sustained
attention/concentration, general memory, executive functions, and bilateral UE

NEUROPSYCHOLOGICAL CONSULTATION
NOVICK, KAREN
PAGE 5

NOVICK, KAREN                              WF 04
PRATER, JOHN                               97:
500 MOUNTAIN ROAD            08/13/11
LARKSVILLE                      .PA 18(
HMO NEPA                      YZH101370091

3/3/2008                         ( 6986(

sensorimotor abilities.  Test performance rate was reduced secondary to cognitive/motor
slowing.  Validity of response set was evaluated during the interview and assessment
procedures.  In both instances, the patient performed in a manner which suggested that
she accurately and validly responded to test items.  However, given the 4 month delay
between completion of her evaluation, the neuropsychological findings reported may not
be a reliable sample of her current level of adaptive functioning.

## METHODS OF ASSESSMENT:

Interview (patient, husband)
Review of Past Medical Records (incomplete)
Lateral Dominance Examination
Wechsler Adult Intelligence Scale – Revised (WAIS–R)
Wechsler Memory Scale – III (WMS–III)
Wide Range Achievement Test – 3 (WRAT-3)
Seashore Rhythm Test
Speech Sounds Perception Test
Rey Auditory Verbal Learning Test (RAVLT)
Aphasia Screening Test
Verbal Fluency Test
Sensory Perceptual Examination
Knox's Cube Test
Finger Tapping Test
Dynamometer
Tactual Performance Test (TPT)
Grooved Pegboard
Category Test
Trail Making Test (A & B)
Clock Drawing Test
Letter/Number Cancellation Test
15 Item Memorization Test
Test of Memory Malingering (TOMM)
Beck Depression Inventory (BDI)
Minnesota Multiphasic Personality Inventory-2 (MMPI-2)

## NEUROPSYCHOLOGICAL FINDINGS:

By history (educational/vocational) and the cognitive data obtained, it appears that Ms.
Novick premorbidly functioned within the average range of general intelligence.  With this
benchmark in mind, the following functions were judged below anticipated levels:

Attention/Concentration (fluctuating)
Information Processing Speed (slowed)

NOVICK, KAREN
PRATER, JOHN
500 MOUNTAIN ROAD
LARKSVILLE
HMO NEPA

WF 045Y
97294
08/13/1962
PA 18651
YZH1013700S002
(698659)

NEUROPSYCHOLOGICAL CONSULTATION
NOVICK, KAREN
PAGE 6

3/3/2008

Verbal/Visual Memory
Arithmetic
Manual Motor Speed (bilateral UE)
Grip Strength (bilateral UE)
Executive Functions

All other functions assessed (i.e., fund of general information, vocabulary, auditory comprehension, reading, auditory discrimination of rhythmic sounds, auditory perception) met anticipated performance criteria.

This neuropsychological evaluation suggests that Ms. Novick has reduced adaptive abilities as evidenced by scores on standardized neuropsychological indices (abbreviated; Halstead Impairment Index 0.3, Neuropsychological Deficit Scale 24). These indices are global measures which attempt to predict the probability of brain dysfunction based on the patient's overall test performance. In this instance, the indices in all likelihood would fall within the mild range of impairment if extrapolated utilizing anticipated TPT scores. Despite this, a severe limitation in general memory was noted on the WMS-III (General MQ 64). Specific analysis of the data, considering a variety of factors to more precisely determine the presence, extent, locus and nature of impairments, supports this notion. These findings appear to be an adequate representation of her age peers based on normative data including socio-economic, educational, ethnic and personality status.

Ms. Novick's intellectual abilities appear generally commensurate with anticipated estimates (average range). For example, on the administration of the WAIS-R, she achieved an FSIQ of 106, ± 5. This is a score at the 66th percentile rank relative to expectation for her age and one which reflects average general intellectual and problem-solving resources. Given her effort which was optimal throughout the evaluation and the psychometric properties of the WAIS-R, it can be calculated that the chances are about 90 out of 100 (i.e., 90% confidence level) that her "true" FSIQ currently falls within the range of scores from 101 to 111. A moderate degree of intratest scatter was noted as her scaled scores range from seven (digit span) to fifteen (comprehension). A one point discrepancy between VIQ (106) and PIQ (105) is neither statistically nor clinically significant for lateralized deficits. Her combined scores on the WRAT-3 yield a basic academic skills quotient (102) which is within the average range and at the 55th percentile rank. Her performance in arithmetic (87) was below other academic domains (reading 113, spelling 106). Most striking was her performance on formal memory assessment. Specifically, on the WMS-III, she achieved a General Memory Index (64) which was well within the mentally deficient range and at the 1st percentile rank. Overall, Ms. Novick has difficulty processing, consolidating, and retrieving information presented through both verbal/auditory and visual channels. Despite this, memory variability is noted. For example, her performance on the RAVLT must be considered vastly higher as opposed to the WMS-III.

0-
NOVICK, KAREN                    WF 045Y
PRATER, JOHN                     97294
600 MOUNTAIN ROAD                08/13/1962
LARKSVILLE                       PA 18651
HMO NEPA                         YZH10137009002

3/3/2008                         ( 698659 )

NEUROPSYCHOLOGICAL CONSULTATION
NOVICK, KAREN
PAGE 7

Additional neuropsychological measures suggest fluctuating attention/concentration,
slowed information processing speed, and primary reductions on tasks involving tactual
performance speed, executive functions (insight, planning, organizing), and bilateral UE
sensorimotor abilities.

Behaviorally, Ms. Novick clearly presents with ongoing adjustment difficulties manifested
by depression, frustration, anxiety, and somatic preoccupation. Undoubtedly, there is a
positive correlation between emotional distress and physiological symptoms, especially
fatigue and pain. These symptoms, in and of themselves, have a deleterious effect on an
individual's ability to ward off stress. Specifically, as pain and fatigue increase, so does
emotionality and the inability to successfully manage stress. As previously noted, Ms.
Novick reported numerous neurovegetative depressive symptoms including hypersomnia
with associated generalized fatigue, weight loss, dysphoria, crying, diminished libido, and
reduced interest. She denied suicidal ideation/intent. This coincides with formal
personality assessment. Specifically, scores on both the Beck Depression Inventory (23)
and depression scale on the MMPI-2 (T score 90) are well within the severe ranges of
depressive symptomatology. Furthermore, seven additional clinical scales on the MMPI-2
were elevated above T score of 65 with highest elevations on hysteria (106) and
hypochondriasis (103). This profile formulates what is known as a "conversion V" and is
often characterized by individuals who have an extreme need to interpret their problems
in living in a socially acceptable fashion. Secondary gain and interpersonal manipulation
via illness is almost always present. The major symptom reported is pain which usually
occurs in the head, neck, extremities, and gastrointestinal system. Few of these
individuals are incapacitated by their symptoms, however, there is a tendency to develop
such symptoms under increased internal/environmental stress. This profile also reflects
an individual who at times has an agitated depression and experiences anxiety, unusual
thought processes, and over-suspiciousness. Her elevated F scale (T score of 72) might
reflect an individual with an exaggeration of existing symptoms or possibly a "cry for help".

SUMMARY:

In summary, the above enumerated findings, with a reasonable degree of neuropsycho-
logical certainty, represent a blend of etiologies including primary pain and fatigue and
behavioral alterations, likely due to an autoimmune disorder (i.e., Lyme disease).
General indices of neuropsychological functioning were abbreviated secondary to Ms.
Novick's abandonment of the TPT; if prorated, it is likely that her overall
neuropsychological indices would fall within the mild range of impairment. However, this
is speculative. Furthermore, her performance across numerous neuropsychological
subtests was marred by test performance variability and inconsistency. For example, she
performed poorly on verbal memory subtests of the WMS-III as opposed to a relatively
intact performance on the RAVLT. Furthermore, attention/concentration levels on the
WMS-III were reduced, however, her performance on both the Seashore Rhythm Test
and Speech Sounds Perception Test, (measures of sustained attention/concentration)

0-
NOVICK, KAREN                                    WF 045Y
PRATER, JOHN                                        97294
500 MOUNTAIN ROAD                              08/13/1962
LARKSVILLE                                      PA 18851
HMO NEPA                                  YZH10137009002

3/3/2008                                        ( 698659 )

NEUROPSYCHOLOGICAL CONSULTATION
NOVICK, KAREN
PAGE 8

were well within the normal range. These and other aspects of performance variability often reflect a behavioral component. In this instance, depression, anxiety, and frustration.

From an etiologic perspective, Ms. Novick, in all likelihood, presents with some degree of autoimmune encephalopathy secondary to Lyme disease or other concomitant disorder (i.e., heavy metal). According to the clinical literature, patients with Lyme disease often report memory deficits as well as depression and other adjustment difficulties. While Ms. Novick's CSF testing was normal, there is the possibility that the test results reflect a false negative. According to Dr. Horowitz, Ms. Novick's clinical symptomatology and presentation reflects Lyme disease, babesiosis, and elevated heavy metals. To date, the undersigned is unclear as to whether or not Ms. Novick has active Lyme disease of intrathecal antibody production. However, she clearly does not appear as cognitively efficient now as she was in the past.

At a functional level, Ms. Novick remains independent in the vast majority of activities of daily living (ADL). She is able to remain at home unsupervised, and participate in basic, albeit minimal chores including meal planning and preparation, as well as managing daily and monthly finances, occasionally driving an automobile short distances, and socializing with friends (i.e., an occasional movie). She has been unemployed from February 6, 2007 and she is currently in the appeal process of obtaining Social Security Disability benefits. Given her overall presentation and chronicity of her symptoms, her prognosis remains guarded.

**DIAGNOSTIC IMPRESSIONS:**

Probable Autoimmune Encephalopathy (Lyme disease; by history)

**RECOMMENDATIONS:**

In view of the current findings, the following recommendations are suggested:

1.  Continue to be followed medically per her primary care physician (Dr. Prater) and other medical specialists (Dr. Horowitz) for the monitoring of her general medical and neurological status.

2.  Given Ms. Novick's current presentation and neuropsychological test data, it is recommended that she undergo repeat neuroimaging including a cerebral MRI and possible neuroSPECT scan.

3.  Ms. Novick's current medication regimen, which is extensive, should be closely monitored and evaluated on an ongoing basis. In part, her current neuropsychological test results might reflect an adverse medication effect.

NEUROPSYCHOLOGICAL CONSULTATION
NOVICK, KAREN
PAGE 9

NOVICK, KAREN                    WF 045Y
PRATER, JOHN                      97294
500 MOUNTAIN ROAD              08/13/1962
LARKSVILLE                    : PA 18651
HMO NEPA              YZH10137009002

3/3/2008                       ( 698659 )

4.   Mr. Novick presents with ongoing adjustment difficulties manifested by depression, frustration, and anxiety. Thus, it is recommended that she commence a trial of insight-oriented psychotherapy and biofeedback assisted relaxation techniques to assist her in developing more feasible coping strategies.

5.   A baseline of neuropsychological functions has been established. Repeat neuropsychological evaluation in 6-8 months is recommended to compare/contrast previous findings. At that time, additional impressions and recommendations can be made.

6.   Share the results of this evaluation with Ms. Novick and assist her with the implementation of these recommendations.

Michael J. Raymond, Ph.D.
Director, Clinical/Forensic Neuropsychology
Clinical Director, Brain Injury Program
Diplomate, American Board of Professional Neuropsychology

dd:  MJR, Ph.D. – 8/12/08
tr:  sw – 8/14/08

cc:  Dr. Prater
     Dr. Horowitz

Enclosure:  Neuropsychological Data Summary Sheet
            Functions Assessed Sheet

# Exhibit 9

### MARK LUKAS, ED.D.
#### VOCATIONAL & EVALUATION SERVICES

27 WEST THIRD STREET
MEDIA, PENNSYLVANIA 19063-2803

EVALUATIONS
TESTING
COUNSELING

610-565-7466
FAX: 610-565-7380

February 11, 2009

Alan H. Casper, Esquire
121 South Broad Street
20th Floor
Philadelphia, Pennsylvania 19107

Re: Karen Novick
Birth Date – 8/13/62
Your File No. 1054

## *Vocational Evaluation Report*

In response to your request for a vocational evaluation, Karen Novick was seen October 28, 2008. At that time, an interview was conducted in addition to the administration of a battery of tests. Pursuant to the evaluation, the following documents were provided and reviewed: Report of John M. Prater, M.D., dated July 31, 2007; reports of Richard I. Horowitz, M.D, dated October 10, 2007, and January 11, 2008; report of Sanjeev Garg, M.D., dated March 14, 2007; report of Scott Sauerwine, M.D., dated March 7, 2007; report of Eugene S. Eskow, M.D., dated September 13, 2007; report of telephone consult of John Fallon, FNP, dated January 14, 2008; reports of D. Dennis Payne, Jr., M.D., dated November 19, 2007, and February 8, 2008; neuropsychological consultation report of Michael J. Raymond, Ph.D., dated August 25, 2008; and transcript from Misericordia University.

Ms. Novick, age 46, indicated that she suffered the onset of Lyme disease in response to a tick bite which occurred on January 6, 2007. She reported that following that incident, she had begun to experience flu-like symptoms and was treated accordingly. She noted that ultimately, the symptoms intensified and she was hospitalized for a brief time. She has since been diagnosed with Lyme disease and has been under active treatment with a specialist. She continues with a number of symptoms including joint pain, muscle burning, joint stiffness, problems with balance, difficulties with attention, concentration and memory, and fatigue which, she advised, was quite severe. She remains in active medical care and treatment and has employed a number of medications. She underwent a six month trial of medications administered through a pic line which has since been discontinued though she continues on a number of oral medications. The scope and intensity of her constellation of symptomatology has

Karen Novick
Page 2

resulted in separation from the job market and she remains occupationally displaced and unemployed to the present.

*Vocational Information*

Ms. Novick indicated that at the time of the onset of her symptoms in January, 2007, she had been employed full-time with MetLife, an insurance company, in the information technology department as a business systems analyst. She began that employment in October of 2004, and had been on the job about two years at the time of the onset of her symptoms. She noted that her duties involved gathering information related to business client needs. She interfaced with business clients with respect to their need for data function. She then determined the specific requirements and interfaced with software and technical support personnel with respect to configuring software systems in accordance with end-user-requirements. At times, she traveled to a business client facility in Tampa, Florida. She reported that there were walking and standing demands but she felt her duties were primarily intellectual in nature. She spoke of significant analysis demands. She assisted with training related to software upgrades and ensured that software modifications met client needs. She worked a full-time schedule and estimated a work week extending to in excess of 50 hours. She was compensated at the rate of $72,000.00 annually and it was her understanding that there were opportunities for bonuses. She advised that her job performance had been quite satisfactory and was identified as a good business performer. She anticipated remaining in the information technology field. In the aftermath of the tick bite in early January, 2007, and subsequent diagnosis of Lyme disease, she attempted to continue to engage in her customary job activities, however, experienced difficulties going into the office. She was granted permission to work as a telecommuter. She did so for about one month but indicated that she experienced difficulty keeping up with the complexities of the work and associated intellectual demands. She subsequently discontinued employment, to her recollection, under medical recommendation in February of 2007. She has not worked since that time. She lamented her inability to continue to engage in full duty employment activities and is pessimistic about her ability to engage in competitive employment.

Prior to this, she described an approximate nine year affiliation with Alltel Information Services in Wilkes-Bare, Pennsylvania. She began as a quality assurance coordinator and served in that capacity for approximately three years. She noted that this company provided software solutions for wireless communication companies. She interfaced with customers and had developed a specialization in billing software. She supervised a group of quality control workers and spoke of some travel associated with that employment, noting that she traveled to Jamaica and the Dominican Republic to her recollection. She spoke of primarily light exertional demands but reported that her work was mostly intellectual in nature. Ms. Novick advised that she was well regarded in this position and thereafter, advanced to the position of business analyst which was a promotion. In this capacity, she interfaced with software engineers and quality support individuals. She served in that capacity for a period of somewhat less than one year and

Karen Novick
Page 3

thereafter, advanced to work as an information technology business consultant. She served in that capacity over a period of about five years. She noted that this was a management position and she was compensated at the rate of approximately $60,000.00 annually. She was engaged in some project management activities. She reported that she led multiple projects, and provided support related to credit monitoring and billing systems. Ms. Novick indicated that Alltel also provided customer care software products and she interfaced with end-users. She reported some travel demands as she was the company representative related to business clients. She spoke of sedentary to light physical demands in that job and described the position as quite intellectual and complex in nature involving analysis. She indicated that, over the years, she had developed specific skills associated with interpreting customer needs and then transmitting information to software engineers in order to configure software to end-user requirements. She was well regarded in her position.

Ms. Novick indicated that her employment with Alltel was quite time demanding, estimating a work week sometimes extending to 50 hours. Over the course of her employment with this company, Ms. Novick advised that she occasionally picked up some part-time work as a bartender. She did so sporadically on evenings and weekends. She described herself as quite an energetic worker.

Prior to this, Ms. Novick described a period of two years of employment at Systematics Telecommunication Services, a customer software provider associated with IT solutions for the telecommunications industry. She worked a full-time schedule at a technical facility located in Dallas, Pennsylvania. In pursuit of this work, she provided customer and client support services and described primarily sedentary exertional demands in that work.

Before this, she described a period of approximately three years of full-time employment at Cellular Plus in Avoca, Pennsylvania. This was a telecommunications company and she was primarily engaged in collections. She interfaced with customers and arranged for payment, worked with legal personnel in regard to the enforcement of payment arrangements, and related activities. She spoke of primarily sedentary exertional demands in that work.

Prior to this, Ms. Novick indicated that she was employed for five or six years at Zayre's, a discount retail store, as a manager. She managed several departments within the store and described light to medium demands in that work depending upon stocking responsibilities. As a young woman, she worked in a pizza restaurant, performing food preparation, waitressing and cashiering functions.

Over the course of her work life, Ms. Novick advised that she had always maintained full-time employment and her work history has been continuous. She indicated that she never experienced any gaps in her employment until the time of the onset of her symptomatology in early January 2007. She lamented her inability to resume job market activities.

Karen Novick
Page 4

*Social/Educational Information*

Ms. Novick (5'4", 115 pounds) indicated that she has realized a weight loss since January of 2007. She indicated that, at that time, her weight had been somewhat in excess of 120 pounds. She is married and has no children. She resides in Larksville, Luzerne County, Pennsylvania. She reported that she is somewhat ambidextrous. She writes with her right hand and is able to throw with her left hand.

Ms. Novick graduated from Bishop Hoban High School in 1980 where she was involved in the academic course of studies. She subsequently attended Luzerne County Community College and earned an associate of science degree with an academic emphasis in criminal justice. Thereafter, through the late 1980's, and concurrent with her employment at Zayre's, she engaged in part-time educational initiatives through Wilkes University. She has focused her efforts upon business studies. Thereafter, in the late 1990's, she enrolled at Misericordia University and transferred her credits from Wilkes. She participated in professional development-related training and indicated that she had engaged in academic studies through the course of her employment at Alltel. She briefly suspended participation at Misericordia prior to the onset of her symptomatology in January, 2007. At that time, she reported that she had focused her educational efforts and energies upon in-house and professional development training offered through MetLife. She had received a number of certifications. In 2002, she had received an E-Commerce certification. She advised that her professional development training activities through MetLife had been primarily focused upon the insurance industry in general and information technology. Ms. Novick indicated that, prior to the onset of her symptoms in January, 2007, it had been her intent to complete her baccalaureate degree program through Misericordia University. She reported that she has never returned to college in that regard.

Ms. Novick indicated that, prior to the onset of her symptoms, she had enjoyed participation in outdoor and recreational activities including hiking, mountain biking, and riding ATVs (all terrain vehicles). She now finds she is simply unable to engage in these or vigorous types of activities owing to her symptomatology. She advised that she and her husband had also enjoyed traveling and owing to the volatility and unpredictability of her symptoms, she has discontinued traveling. She reported that she was transported to this vocational evaluation by her husband.

*Health Information*

Ms. Novick spoke of generally satisfactory health throughout childhood and adolescence. She had primarily suffered sports-related fractures as a younger woman. Through the 1980's, her health had been good. In 2000, she underwent foot surgery, a bunionectomy. In August of 2006, she was involved in a motor vehicle accident and suffered whiplash injuries related to her cervical spine. She noted that she realized a good recovery in the presence of those injuries and they never significantly inhibited her ability to engage in professional employment activities.

Karen Novick
Page 5

Significantly, Ms. Novick spoke of suffering a tick bite and resulting symptomatology which, she advised, was later diagnosed as Lyme disease. She recalled a hospitalization early on owing to the severity of her symptomatology. She reported that she has been treated by her family physician and has sought the care of specialists. She has come under the care of Dr. Horowitz. She was seen by a number of specialists in the Northeastern Pennsylvania Area. She indicated that a pic line was employed as a means of medicating. She noted that the pic line was successful, to an extent, in moderating some of the more acute dimensions of her symptomatology. However, she continues with ongoing multiple symptoms. She utilizes a number of medications.

Presently, Ms. Novick indicated that her sitting tolerance is about one hour. She can stand but estimated a standing tolerance of about 10 minutes with support. She walks to the end of her driveway, a distance of about 600 feet. She experiences fatigue which is chronic and can sometimes be intense and debilitating. It should be noted that through the course of the vocational interview process, Ms. Novick asked to be excused. She lay down for approximately one hour which, she advised, was due to the sudden onset of fatigue. She experiences fatigue which can occur quite spontaneously. Her sleep is disturbed. She described her physical tolerances as quite limited. She is generally independent in activities of daily living including dressing and bathing but must do so more slowly. She experiences electrical-like sensations in her upper extremities. She feels her balance may be somewhat impaired. She experiences chills and sweats. She also occasionally experiences joint pain and stiffness. She spoke of significant cognitive difficulties including problems with attention, concentration and memory. She is quite forgetful. She has difficulty reading materials for comprehension. She finds that her fatigue can sometimes be quite debilitating. She feels her symptomatology has not improved substantially, however, she advised that some of the treatment modalities offered by Dr. Horowitz have, to an extent, moderated some of the more severe dimensions of her limitations. She spoke of feelings of frustration and disappointment in the aftermath of the injuries.

*Test Results*

The Kaufman Brief Intelligence Test (K-BIT2) was administered as a measure of general intellect and Ms. Novick placed within the upper end of the average range.

The Wide Range Achievement Test (WRAT4) was administered to assess a current level of her cognitive skills and abilities. On the word reading portion of the test, she attained a standard score of 108 and a grade equivalent greater than 12.9. On the sentence comprehension portion of the test, her attained standard score was 103 with a grade equivalent greater than 12.9. On the mathematical portion of the test, she attained a standard score of 90 with a grade equivalent of 7.4.

On the Minnesota Clerical Test, which measures clerical speed and accuracy skills, Ms. Novick placed below average (10th percentile) on the numbers subtest when compared with clerical applicants.

Karen Novick
Page 6

On the How Supervise Test, which measures one's knowledge and insight into human relations in industry, Ms. Novick placed above average (65th percentile) when compared with lower level supervisors.

On the Nelson Denny Reading Test, a measure of reading comprehension, Ms. Novick placed with a reading rate at the 4.1 grade level and narrative reading comprehension at the 9.8 level.

On the Handicap Problems Inventory, Ms. Novick noted, as a result of the onset of her health problems, that she now feels more easily discouraged and has lost confidence in work ability. She has trouble accepting her handicap. She feels unsure about earning a good income and fears a loss of ability to work. She finds she cannot financially support her family and worries about overcoming her handicap. She does not take part in all her family does and is discouraged because she does not fit in for all work. She noted that her injuries have required a change of job plans and that she physically cannot do some things around the house. She has concerns about security in later years and seems unable to admit that certain things cannot be done. She is discouraged by time wasted due to the handicap and noted a need to do things differently. She finds some jobs beyond her physical ability and reported that she faces extra hardships. She is unsure of her future work chances and dislikes living life a different way. She does not feel like a whole or complete person and finds she cannot apply her full amount of knowledge and talent. She cannot accept the fact that the handicap is permanent.

*Analysis and Conclusions*

Ms. Novick, now age 46, presents with a high school education and thereafter, attainment of an associate of arts degree with an academic emphasis in criminal justice. Thereafter, Ms. Novick participated in ongoing post secondary studies, through Wilkes-University and Misericordia University working toward an academic specialization associated with business administration as an enhancement to her professional employment activities. Ms. Novick described an initial entry into the job market in food preparation and waitressing occupations. Thereafter, she served as a discount department store manager within the retail trade. She subsequently entered the administrative field and worked as a collections clerk, customer client support representative, information technology business consultant, business analyst, quality assurance coordinator and business systems analyst. The balance of her work has been focused upon administrative, technical and software support positions primarily associated with the telecommunications industry. Over the course of her work life, Ms. Novick has demonstrated the capability to meet employer established qualitative and quantitative work standards and an ability to interact effectively with co-workers, supervisors, the genera public, etc. She has evidenced knowledge of software application practices, procedures and protocols. She has demonstrated a well developed capability to interface with business executive, technical, software engineering and professional staff. She has demonstrated the application of supervisory skills and abilities within a business setting. Her work history has evidenced ascending

Karen Novick
Page 7

occupational responsibilities encompassing increasing levels of complexity and administrative accountability. The nature of her work in the telecommunications industry has primarily been within the sedentary exertional level extending to a restricted range of light. Other work, including employment in the retail trade, has encompassed exertional demands extending into the medium level. Sedentary work is defined as lifting 10 pounds maximum and occasionally lifting and/or carrying articles such as dockets, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met. Light work is defined as lifting 20 pounds maximum with frequent lifting and/or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be only a negligible amount, a job is in this category when it requires walking or standing to a significant degree or when it involves sitting most of the time with a degree of pushing and pulling of arm and/or leg controls. Medium work is defined as lifting 50 pounds maximum with frequent lifting and/or carrying of objects weighing up to 25 pounds.

Testing conducted during this evaluation was structured over the course of a two day work simulation. At the commencement of the first day, Ms. Novick participated in a structured interview and initial intellectual, academic and aptitude testing. Thereafter, through the course of the second day, she had engaged in intellectual assignments primarily associated with reading and summarizing materials encompassing complexities. During the course of the first day, owing to the intensity of her symptomatology, she required a period of approximately 40 minutes to lie down during the morning hours. In the afternoon of the first day, she became fatigued which necessitated an additional period of about 55 minutes in which she was required to rest. On the second day, in addition to a mid-day break, her symptomatology had progressed such that she required frequent breaks during the morning hours. It should be noted that on the afternoon of the second day, her reported symptomatology had advanced to a point which required that she lie down for a period approaching one hour and 15 minutes. She noted the significant onset of fatigue during the course of the two day structured interview and testing protocol.

In regard to testing undertaken the first day of evaluation, Ms. Novick tested with intellect within the upper end of the average range. Her academic capabilities were generally consistent with her educational attainment level with respect to reading and basic sentence comprehension. She placed below average on a measure of clerical ability and above average on a measure of supervisory capability. At the conclusion of the second day, Ms. Novick had participated in a measure of narrative reading comprehension and placed below average both in terms of reading rate and comprehension capabilities. She reported the onset of significant fatigue during the course of the second day of evaluation.

Medical and related records were provided and reviewed during the course of this vocational evaluation. The medical documents refer to Ms. Novick's exposure to Lyme

Karen Novick
Page 8

disease. A narrative report was provided by John M. Prater, M.D., dated July 31, 2007, who noted the presence of multiple symptomatology, including persistent diffuse musculoskeletal pain, paresthesias and progressive cognitive issues, especially issues with memory and concentration. Dr. Prater indicated that her constellation of symptoms has prevented her from returning to work and she remains disabled. He reported that she will be unable to work in the foreseeable future.

Richard I. Horowitz, M.D, in a report dated October 10, 2007, indicated symptoms associated with Lyme disease and reported that Ms. Novick is severely impaired by her symptoms which include chills, sweats, severe fatigue, joint pain affecting her elbows, wrists, hands, fingers, ankles, and knees and stiffness and muscle twitching. He also described the presence of significant burning pains in her body, confusion, difficulty with concentrating and reading for memory, and mood swings. He estimated that she is functioning at 35% of normal. Dr. Horowitz indicated that because of her multiple chronic fibromyalgia-like symptoms, her cognitive impairments, and her severe neuralgia, Ms. Novick is disabled. He indicated that she is unable to uphold responsibilities of her job or any other gainful employment and her condition is as a result of Lyme disease.

Eugene S. Eskow, M.D., in a report dated September 13, 2007, indicated that Ms. Novick continues to have difficulty with concentration and recent memory associated with a sense of profound fatigue. She continues to be unable to work in any capacity due to her illness.

D. Dennis Payne, Jr., M.D., in a report dated November 19, 2007, questioned the presence of objective medical record data to support objective findings associated with the limitations related to Lyme disease. Dr. Payne found Ms. Novick capable of unrestricted work.

Dr. Horowitz, in a report of January 11, 2008, described the relationship between Lyme disease and the onset of her symptomatology. He noted that her clinical picture reflects significantly high symptomatic impairments. She suffers with chills, sweats, severe and disabling fatigue, joint pain, stiffness, muscle twitching, burning, pains, neuralgia, and electrical sensations through her body which incapacitate her, disabling lightheadedness, poor balance, and a host of severe disabling cognitive problems including difficulty with concentration and reading, poor memory and excessive and disabling need for sleep. Dr. Horowitz noted that Ms. Novick remains severely symptomatic and is still disabled. She is not capable of returning to her previous job.

Dr. Payne provided a supplemental assessment of February 8, 2008, and reiterated his earlier findings.

Michael J. Raymond, Ph.D., in a report dated August 25, 2008, indicated that he performed a neuropsychological assessment of Ms. Novick encompassing behavioral observations and neuropsychological testing. Dr. Raymond indicated that the

Karen Novick
Page 9

psychological evaluation suggests that Ms. Novick had reduced adaptive abilities. There was an indication of intellect within the above average range and her genera memory was identified within the mentally deficient range and at the 1% level. Dr. Raymond indicated that overall, Ms. Novick has difficulty processing, consolidating and retrieving information presented through verbal, auditory and visual channels. There were references to fluctuation in attention and .concentration and slowed information processing speed. There were also references to the presence of adjustment difficulties manifest by depression, frustration, anxiety and somatic preoccupation. Dr. Raymond indicated that the neuropsychological indices would fall within the middle range of impairment, however, he noted that this is speculative and there are references to substantial performance variability and inconsistency. Dr. Raymond observed that Ms. Novick clearly does not appear as cognitively efficient now as she was in the past. Based upon the presentation and chronicity of her symptoms, her prognosis remains guarded. A number of treatment recommendations were offered.

Based upon findings in this evaluation and the documents reviewed, it is quite evident that Ms. Novick is now significantly impaired in the aftermath of the diagnosis of Lyme disease in early 2007. She now experiences a significant constellation of symptomatology which has remained unremediated despite ongoing medical care. She continues with joint and muscle pain, stiffness, balance problems, difficulties with memory, concentration and attention and a significant level of fatigue. While there is discord in the medical records reviewed concerning the presence of objective medical data supporting her symptoms, it is evident that, prior to the Lyme disease exposure, Ms. Novick had been a full and active participant in the job market engaged in administrative, managerial, supervisory and other occupational areas capitalizing upon well developed cognitive and intellectual capabilities within a business and software applications environment in the telecommunications industry. She had maintained a steady presence in the job market with ascending responsibilities over the course of her career. In the aftermath of the diagnosis of Lyme disease and ensuing symptoms, Ms. Novick had briefly attempted to return to work in a telecommuting circumstance, however, was simply unable to meet the intellectual demands and complexities of her employment. There is medical consensus among her treating physicians concerning the scope and intensity of her symptoms and she has been medically identified as disabled.

Through the course of the two day vocational evaluation, Ms. Novick's symptomatology, particularly with respect to fatigue, had become quite conspicuous despite her efforts to persevere through the course of the evaluation. She required frequent rest periods and, at times, appeared quite lethargic and fatigued, particularly through the course of the day. It is noteworthy that initial testing undertaken at the commencement of the evaluation reflected well developed intellect and intact academic capabilities. Testing undertaken at the conclusion of the two day evaluation reflected significantly diminished reading efficiency and reading comprehension capabilities. It is evident that in her present state of health, Ms. Novick would not be able to meet the customary demands generic to any type of competitive employment. This includes factors such as consistency and regularity in attendance and punctuality, an ability to meet reasonable

Karen Novick
Page 10

employer established productivity standards and the capability to interact effectively with co-workers, supervisors, the general public, etc., and to do so on a continuous and sustained basis. It is evident that the presence of her symptomatology now prevents Ms. Novick from meeting these very basic and generic characteristics of competitive employment.   Accordingly, she remains disabled and unable to participate in meaningful job market activities.

I would be most pleased to review any additional documents, should they become available, which may have some bearing upon the opinions and conclusions contained herein which are offered with a reasonable degree of vocational certainty.

Thank you for providing the opportunity to perform the vocational evaluation of Karen Novick.

Sincerely yours,

*Mark Lukas/dmc*

Mark Lukas, Ed.D., C.R.C.

ML/dmc

# Exhibit 10

# Richard I. Horowitz, M.D.
Diplomate, American Board of Internal Medicine

(845)-229-897
Fax: (845)-229-893
Email: HHvhac@aol.cor

4/6/09

To whom it may concern,

I have been the treating physician for Ms Karen Novick, DOB 8/13/62 since September
2007. She presented to our medical office on 9/27/07 for a second opinion regarding her
Lyme disease and multiple chronic symptoms that had not responded optimally to prior
antibiotic therapy. The following report will outline her history of diagnosis and
treatment, responses to medication, and subsequent disability.

The patient had an embedded tick in 2007, and fell severely ill one week after the tick
bite where she required hospitalization. Despite extensive diagnostic testing in the
hospital, her workup only found mildly elevated levels of arsenic in her blood, with a
negative MRI of the brain and spinal tap. She continued to worsen post-hospitalization,
and sought treatment by Dr Eugene Eskow in New Jersey, a known Lyme specialist and
rheumatologist. He placed her on minocycline with only minimal benefit, and despite
months of antibiotic therapy, she continued with an array of disabling symptoms
including chills, sweats, weight gain, severe fatigue, joint pains in her elbows, wrists,
hands, fingers, ankles, and knees , headaches, neuralgia type pains, lightheadedness and
poor balance, significant memory and concentration problems, and mood swings. Since
she had not responded to the prior antibiotic regimen, we rotated her to a different
antibiotic regimen with Plaquenil, Biaxin, Septra, and Malarone, and testing for other
tick-borne diseases was sent out with hormonal testing and testing for heavy metals. It
should be noted that the Lyme testing that the patient brought in from her prior treating
physician Dr Eskow, showed definitive exposure to borrelia burgdorferi, the organism
that causes Lyme disease. This was based on the fact that she showed evidence of the
outer surface protein C (23 kda band on the Western Blot) in her blood. It was therefore
our opinion on the first visit that Ms Novick had definitely been exposed to Lyme
disease, and the fact that she had taken doxycycline shortly after her tick bite may have
abrogated a more vigorous immune response. We ruled out other medical problems on
the first visit (such as rheumatoid arthritis or other autoimmune diseases), but did find
elevated levels of mercury and lead on heavy metal testing (lead level 16, normal less
than 5; mercury level 21, normal level less than 4). She was subsequently chelated with
low dose DMSA (orally), and her levels did decrease over time. Unfortunately, this has
not had any significant effect on her overall symptomatology.

During the next several months of antibiotic therapy, there were some mild
improvements in symptoms, but her fatigue, joint pains, cognitive problems and
neuropathy symptoms continued to be disabling, with the patient only functioning at
approximately 35% of her normal level of functioning. On 12/2007 she was rotated to a
stronger regimen against Babesiosis, a malarial type organism frequently associated with
Chronic Lyme Disease. This was suspected because of the amount of sweats and chills
present in a woman having normal menstrual cycles, who was not yet menopausal. Her
follow-up visit on 1/14/08 did show some minimal improvements with this regimen, but
Ms Novick had difficulty with the regimen because of the severity of Jarish-Herxheimer

## COMPLAINT EXHIBIT 10

flares. These are symptomatic increases in baseline symptoms due to the antibiotic therapy, and she has been plagued by extremely severe Herxheimer reactions during the last several years of therapy. Every time that a new therapy is introduced, she has had difficulty tolerating the side effects of the treatment as the bacteria are being killed off. There are a significant number of Chronic Lyme patients who suffer from this problem, and it interferes with effective therapy since the regimens must frequently be decreased or stopped as the symptoms become intolerable. We tried adding Elavil 10 mg at bedtime and Cymbalta in the morning to help with the frequent awakening at night and neuropathic pain during the day, hoping that these would mitigate the severity of the reactions. Unfortunately, Ms Novick continued to have difficulty with flares despite this regimen, and on 2/29/08 we rotated her regimen from Omnicef and Biaxin to doxycycline and Ievaquin. Again she had difficulty tolerating the regimen, and we decided to petition for IV Rocephin since she was failing oral regimens. Again, the same problem arose with severe Jarish-Herxheimer flares, and the IV medication was unable to be continued. We tried rotating her to a different IV medication (IV doxycycline) on 6/08 before giving up on IV therapy, but she had a poor response with more muscle pain and increased numbers of days in bed sleeping for long periods of time. There were small improvements in brain fog and neuropathy, but overall she did not show any sustained clinical improvements even with aggressive IV therapy.

Over the next several months Ms Novick was tried on other oral regimens (high dose oral Amoxicillin with Plaquenil, Mepron and Biaxin), and although there again were some small improvements in energy and joint pain, the Herxheimer flares persisted , so she was rotated to intramuscular shots of Bicillin on 9/10/08, with Lariam for the ongoing shaking chills and drenching night sweats. As of 2/26/09, she had been on 5-6 months of Bicillin, Plaquenil and Rifampin. There were 2 good months in November and December, but the Jarish-Herxheimer flares returned in January and required extensive bed rest. As of her last office visit on that date, the fatigue, brain fog, joint pain and neuropathy were her worst symptoms, and she was still functioning at an overall score of 35% of normal.

As you can see from Ms Novick's clinical course, although there have been some minor improvements in some areas, she remains disabled with respect to her own occupation, and any occupation. I reviewed the reports by Dr's Raymond and Lukas, and their conclusions are consistent with my own. Ms Novick is unable to return to work. This is based on the severity of her physical symptoms, with debilitating fatigue, joint pain, nerve pain, and cognitive dysfunction.

Ms Novick has been a compliant patient, and is clearly motivated to return to work. Unfortunately she has failed classical therapies for Chronic Lyme disease, which have included both multiple oral, IM and IV therapies. Considering the length of therapy and different therapies employed, I consider her completely disabled in her profession and in any profession due to Chronic Lyme disease. Since she has been treated for approximately one and one half years in our medical facility with varying dosages and routes of administration of antibiotics and continues to be extremely ill, I do not foresee a significant change in her condition in the near future.

I hope that this summary has been helpful. Please contact my office if I can be of any further assistance.

Sincerely,

MD