USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: _12/17/2012_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

KAREN NOVICK,

                *Plaintiff,*

        *-against-*

METROPOLITAN LIFE INSURANCE
COMPANY and METLIFE OPTIONS AND
CHOICES PLAN NO. 512,

            *Defendants.*

Before: Richard K. Eaton, Judge[*]

Court No. 09 Civ. 6865 (RKE)

--------------------------------------------------------------x

## OPINION and ORDER

    Eaton, Judge:  Plaintiff Karen Novick brings this action under the Employment

Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1001 et seq. (2006).  By her

complaint, Ms. Novick alleges that defendant Metropolitan Life Insurance Co. ("MetLife"), Ms.

Novick's employer and ERISA plan administrator, wrongfully terminated her short-term

disability ("STD") benefits and wrongfully denied her long-term disability ("LTD") benefits

under the terms of the MetLife Options & Choices Plan No. 512 (the "Plan").  Compl. ¶ 45 (ECF

Dkt. No. 1).  Defendants move for summary judgment, claiming that their decision to deny Ms.

Novick's claim for benefits was not arbitrary and capricious.  Ms. Novick cross-moves for

summary judgment, alleging that she is entitled to both STD and LTD benefits under the Plan.

Defendants' motion to strike is also before the court.

------------------------

[*]    Judge Richard K. Eaton of the United States Court of International Trade, sitting
by designation.

For the reasons set forth below, defendants' motion to strike (ECF Dkt. No. 66) is GRANTED, defendants' motion for summary judgment (ECF Dkt. No. 48) is DENIED, in part, and plaintiff's motion for summary judgment (ECF Dkt. No. 54) is accordingly GRANTED, in part. MetLife is to award Ms. Novick STD benefits for the entire twenty-six week period, adjusting for payments already made, and her LTD benefits claim is REMANDED to defendants who must process the application and notify Ms. Novick, in writing, of their decision.

## BACKGROUND[1]

Ms. Novick was employed by MetLife from October 29, 2004 to February 6, 2007. Defs.' Local Rule 56.1 Statement ¶¶ 2, 6 (ECF Dkt. No. 51) ("Defs.' 56.1 Stmt."). As part of her employment, Ms. Novick participated in the Plan, established pursuant to ERISA, which provides both STD and LTD benefits to eligible participants. Defs.' 56.1 Stmt. ¶¶ 7–8. MetLife was the Plan's fiduciary and administrator as defined by ERISA.

In early January 2007, Ms. Novick was bitten by a tick. Pl.'s Local Rule 56.1 Statement ¶ 9 (ECF Dkt. No. 56) ("Pl.'s 56.1 Stmt."). At this point, Ms. Novick's primary care physician, Dr. Prater, prescribed Doxycycline, although Ms. Novick had not yet been diagnosed with any condition, including Lyme Disease. Defs.' 56.1 Stmt. ¶ 142. Shortly thereafter, Ms. Novick began reporting symptoms of joint pain and stiffness, muscle burning, problems with balance, difficulties with attention, concentration, and memory, and fatigue.[2] Pl.'s 56.1 Stmt. ¶ 10.

---

[1]     The court has taken the facts described below from the parties' Rule 56.1 statements and MetLife's STD and LTD Benefits administrative claim files for Ms. Novick. Where only one party's Rule 56.1 statement is cited, the opposing party does not dispute that fact or has offered no admissible evidence to controvert it.

[2]     It is unclear when Ms. Novick's primary symptoms began. In December 2006, mold was discovered in Ms. Novick's home and was professionally removed. Defs.' 56.1 Stmt. ¶ 3, 57. Thereafter, Ms. Novick suffered from an episode of asthmatic bronchitis. Defs.' 56.1

Thereafter, Ms. Novick was hospitalized from January 26 to 28, 2007 at Dr. Prater's direction after her husband reported that she was "doing poorly," was suffering from "severe fatigue," and was "very weak." Defs.' 56.1 Stmt. ¶ 5, 146; STD Benefits Administrative Claim File, Hallford Dec. Ex. B, at 610, 866 ("STD Admin. R.").[3] On a February 13, 2007 MetLife Physician Questionnaire, Dr. Prater noted that Ms. Novick's primary diagnosis was "chronic fatigue/protracted weakness" and the "[s]igns and symptoms preventing [Ms. Novick] from working" were "severe fatigue/weakness." STD Admin. R. 866, 871. Dr. Prater also noted that Ms. Novick's "[e]stimated return to work date full time" was "unknown/work-up in progress," and that Ms. Novick was "currently unable to work more than 0 hours/day." STD Admin. R. 867, 872. Ms. Novick then saw a rheumatologist on February 22, 2007, who reported "no obvious rheumatologic cause" for her symptoms. STD Admin. R. 611, 849.

By March 1, 2007, Dr. Prater's office notes indicated that Ms. Novick complained of daily chronic fatigue, occasional joint pain, poor energy, and an inability to work or get things done. STD Admin. R. 849. On March 7, 2007 the results of a magnetic resonance imaging

---

Stmt. ¶ 3. Earlier medical records indicate that her reported symptoms began while she was recovering from the asthmatic bronchitis. For example, Dr. Turel, a neurologist who examined Ms. Novick on April 17, 2007, notes that Ms. Novick "states that in December of 2006 that she had an episode of asthmatic bronchitis for which she was being treated. . . . [S]he specifically states that on January 17th, she awoke while recovering from the bronchitis and had symptoms that were reported to be flu-like in nature. She was unable to get out of bed. She felt extremely fatigued." STD Benefits Administrative Claim File, Hallford Dec. Ex. B, at 603 ("STD Admin. R."). In contrast, Ms. Novick's later medical records date the beginning of symptoms as after the tick bite. For example, the September 27, 2007 office visit notes from another doctor state that Ms. Novick "was in her usual good state of health until receiving a tick bite on January 6, 2007. . . . One week later the patient fell severely and abruptly ill and had intense flu-like symptoms." STD Admin. R. 498 ("She remained well between October [2006] and the acute illness in January [2007].").

[3]      It appears that portions of the administrative record for Novick's LTD benefits claim were duplicated into the STD benefits claim file at pages 627 through 813. The duplicated pages also appear in the proper place in the LTD Administrative Claim File. For this reason, the duplicated pages are not referenced in this opinion.

3

("MRI") test revealed "[f]ive nonspecific foci of signal abnormality, subcortical white matter of both hemispheres,"[4] which the reviewing doctor noted could be caused by "microangiopathic change if the patient ha[d] a significant history of diabetes or hypertension. Other considerations include[d] migraine headache, vasculitis and demyelinating disease, although there [was] nothing specific about the appearance to suggest MS. . . . The remainder of the evaluation [was] unremarkable." STD Admin. R. 852.

On March 14, 2007, a neurologist noted that the "MRI of the brain from 03/07/07 was reviewed and does show very small few [sic] white matter abnormal signal changes. Otherwise no other focal abnormality." STD Admin. R. 839. He also "review[ed] [another] MRI of the brain from 03/22/07, which was also normal. Labs were also reviewed which were normal." STD Admin. R. 839. "On examination," he found that Ms. Novick had "vague symptoms with a nonfocal neurological examination" and that she "appear[ed] in no acute distress." STD Admin. R. 839. He also stated that he "discuss[ed] with [Ms. Novick that] at this time I do not believe she has a demyelinating disorder to account for her symptoms. It is possible they are related to an underlying viral syndrome."[5] STD Admin. R. 839.

Dr. Prater then sent an Attending Physician Statement dated March 28, 2007 to MetLife, listing "chronic fatigue syndrome" as his primary diagnosis, with "protracted weakness" as his secondary diagnosis. STD Admin. R. 843. Under the heading "Objective Findings," he listed

---

[4]     The interpreting radiologist described these "foci of signal abnormality" as "five small foci of T2 and [Fluid Attenuated Inversion Recovery] hyperintensity within the subcortical white matter of both hemispheres. This is a nonspecific finding." STD Admin. R. 851. A neurologist who then reviewed the MRI described the "foci of signal abnormality" as "very small few [sic] white matter abnormal signal changes." STD Admin R. 839. He also described this MRI, as well as a subsequent MRI, as "normal." STD Admin R. 839.

[5]     In so stating, the neurologist ruled out a demyelinating disorder, which is a disease of the nervous system in which the myelin sheath of neurons is damaged, including multiple sclerosis, central pontine myelinolysis, transverse myelitis, among other diseases.

the "3/7/07 MRI: subcortical white matter changes with possible demyelinating disease,"
although multiple sclerosis and other demyelinating diseases had already been ruled out. STD
Admin. R. 843. He once again noted that Ms. Novick was "unable to return to work/Diagnosis
& Treatment Plan as yet to be defined," and that she is "unable to perform [her] job duties" due
to "severe fatigue/weakness/lack[s] focus & concentration." STD Admin. R. 844.

On April 17, 2007, Ms. Novick was examined by a second neurologist, Dr. Turel, who
found that she was "alert and oriented. Her speech was fluent. Her recall was normal" and that
she was "in no acute distress." STD Admin. R. 606. Upon examination, he noted that "[a]ll
joints moved normally without evidence of restriction of movement." STD Admin. R. 606. Dr.
Turel also advised Ms. Novick and her husband that "her examination actually looked fairly
stable," and that it was unlikely that she had multiple sclerosis based on the MRI study of the
brain. STD Admin. R. 607.

On June 4, 2007, Ms. Novick was examined by Dr. Albano-Aluquin, a rheumatologist,
whose "impression [was] that Ms. Novick has chronic fatigue syndrome, marked by significant
non-restorative sleep and tender points on exam. She does have a constellation of symptoms that
can be seen in fibromyalgia." STD Admin. R. 567. She also noted that "[i]t is reassuring that
she has [had a] comprehensive autoimmune/infectious disease [workup] and even a neurological
workup which came back negative. . . . I reassured her that she does not have any life threatening
autoimmune rheumatic disease, she can benefit from conditioning exercises and physical therapy
with aquatherapy or myofascial modalities." STD Admin. R. 567.

By July 31, 2007, Dr. Prater reported to MetLife that Ms. Novick "continues with
multiple symptoms [and] . . . has had extensive evaluation which thus far has revealed no
specific diagnosis to account for all these issues." STD Admin. R. 513, 514, 569, 579, 587.

Nonetheless, he concluded that Ms. Novick's "symptoms have prevented her from returning to work and she remains disabled . . . , [and] it does not appear that she will be able to return to work in the foreseeable future." STD Admin. R. 513, 514, 569, 579, 587. Ms. Novick was also examined by Dr. Eskow on August 3, 2007, who reported that Ms. Novick described "pain in all four extremities . . . [including] increasing ankle and elbow pain as well as difficulty with concentration and recent memory," but noted that Ms. Novick was "[a]lert, fully oriented" and had "[f]ull range of motion of wrists, elbows, shoulders, hips, knees and ankle joints bilaterally." STD Admin. R. 568, 572.

On September 27, 2007, Ms. Novick began treatment with Dr. Horowitz, a Lyme Disease specialist, and his nurse, Mr. Fallon. In Nurse Fallon's September 27, 2007 office visit notes, he lists among Ms. Novick's symptoms, "some subjective fevers, . . . fatigue which is severe, . . . joint pains which affect her elbows, wrists, hands, fingers, ankles, and knees[,] . . . headaches but these have resolved . . . [and] significant burning pains in her body which have gotten somewhat better with treatment." STD Admin. R. 499, 539, 545. The report also noted that Ms. Novick "has had extensive diagnostic testing done including a lumbar puncture, MRIs of the brain and of the spine, and extensive rheumatology testing. Other than a mildly elevated arsenic level the patient was not found to have any specific abnormalities that would explain her illness." STD Admin. R. 498, 538, 544. Based on this visit, in a letter to MetLife dated October 10, 2007, Dr. Horowitz concluded that,

> [b]ecause of her multiple chronic fibromyalgia-like symptoms, her cognitive impairments, and her severe neuralgia the patient is disabled at this time. She has had an extensive workup through other medical specialties and no other cause of her condition has been identified. She has a panoply of symptoms that are consistent with chronic neurologic Lyme disease and multiple studies in the peer-reviewed medical literature have documented the ability of Lyme disease to persist despite antibiotic therapy. It is our opinion that Ms. Novick is unable to

6

uphold the responsibilities of her job or of any gainful employment at this time, and that her current condition is the result of Lyme disease.

STD Admin. R. 496, 562.

During a November 28, 2007 telephone consultation, Nurse Fallon noted that Ms. Novick "is showing a positive response to therapy,[6] her good days have definitely increased in number, her bad days have decreased in frequency and intensity. Day-in and day-out a number of symptoms have decreased in both intensity and duration, no symptoms have worsened." STD Admin. R. 460, 464, 465, 470, 519. Nonetheless, he concluded that "her symptoms are still significant and disabling: she is not at all close to being able to resume the responsibilities of her previous job." STD Admin. R. 460, 464, 465, 470, 519. Dr. Horowitz's office then sent MetLife two additional letters: (1) a December 1, 2007 letter from Nurse Fallon (presumably based on the September 27 and November 9 office visits, and the November 28 telephone consultation), which repeats much of the language of Dr. Horowitz's October 10 letter; and (2) Dr. Horowitz and Nurse Fallon's joint January 11, 2008 "Expert report on disability and review of case," which references and reiterates the findings in the October 10 and December 1 letters, but adds an extensive discussion of the peer-reviewed medical literature regarding Lyme disease. STD Admin. R. 447–48, 457–58, 462–63, 468–69, 517–18; STD Admin. R. 202–05. The Expert Report stated that Ms. Novick's "self-described symptoms are consistent with what has been described throughout her medical records and during the time she has been our patient. . . . [S]he is clearly disabled by her panoply of symptoms." STD Admin. R. 202. The Report concluded that "it is our opinion within a reasonable degree of medical certainty that Ms. Novick is disabled by her current symptoms and is not capable of returning to her previous job. . . . Her impairments

---

[6]     Based on Nurse Fallon's November 28, 2007 telephone consultation notes, the "therapy" appears to have been a regimen of medications, including prescription drugs and a variety of herbal and dietary supplements. STD Admin. R. 460, 464, 465, 470, 519.

7

can easily be expected to persist for another year or longer and the prognosis for significant recovery is guarded at this point." STD Admin. R. 205.

## I.     Ms. Novick's STD Benefits Claim

In total, Ms. Novick received four months of STD benefits, from February 7, 2007 to June 8, 2007, before the benefits were terminated for a claimed lack of supporting medical information. STD Admin. R. 195. According to defendants, plaintiff did not supply sufficient medical information relating to her functional limitations, i.e., that demonstrated that her condition prevented her from working.

### A.  Initial Application: STD Benefits Approved for February 6, 2007 to March 7, 2007

Ms. Novick submitted her claim for STD benefits to MetLife on February 6, 2007. Defs.' 56.1 Stmt. ¶ 14. MetLife then asked for a completed Physician Questionnaire from Dr. Prater and interviewed Ms. Novick via telephone. Defs.' 56.1 Stmt. ¶ 21, 35. MetLife also spoke with Dr. Prater's office and was informed that Ms. Novick was on complete bed rest and could not return to work until she was evaluated again on March 7, 2007. Defs.' 56.1 Stmt. ¶ 39. Accordingly, on February 20, 2007, MetLife approved Ms. Novick's claim for STD benefits from February 6, 2007 through March 7, 2007 due to "chronic fatigue" and "severe weakness." Pl.'s 56.1 Stmt. ¶ 15. An approval letter sent to Ms. Novick specified that "to consider the claim for possible continuation of benefits we will require specific medical information. The additional medical information must demonstrate that you continue to be disabled past March 7, 2007." STD Admin. R. 864.

On March 6, 2007, MetLife telephoned Ms. Novick to request updated medical records and was informed that she would be undergoing an MRI and additional blood work, the results

of which would be faxed to MetLife. Defs.' 56.1 Stmt. ¶¶ 44–45. A few days later, Dr. Prater's office telephoned MetLife to report that Ms. Novick was still suffering from fatigue, weakness, and confusion, her concentration was "off," that she had undergone a MRI of the brain, and that she was unable to return to work given her condition. Defs.' 56.1 Stmt. ¶¶ 46–48. A MetLife Claim Examiner discussed the medical information with Ms. Booth, a MetLife Clinical Support Specialist, who agreed that Ms. Novick was totally disabled from working at that time, and recommended extending the STD benefits for two weeks until MetLife received the findings from the MRI. Defs.' 56.1 Stmt. ¶¶ 49–50.

### B. First Extension: STD Benefits Extended Through March 23, 2007

By letter dated March 9, 2007, Ms. Novick was notified of the extension of STD benefits through March 23, 2007, and was informed that "[t]o consider benefits beyond March 23, 2007, specific information will be needed from your physician." STD Admin. R. 855. Enclosed with the letter was a form "Supplemental Attending Physician Statement" that included a "Physical Capabilities" section. STD Admin. R. 856–59. By fax dated March 15, 2007, Ms. Booth also asked Dr. Prater to submit Ms. Novick's updated medical records and treatment plan. STD Admin. R. 848. On March 23, 2007, Ms. Booth followed-up with Dr. Prater and Ms. Novick's neurologist by telephone to request additional medical information. Defs.' 56.1 Stmt. ¶ 65, 71.

Dr. Prater completed the Supplemental Attending Physician Statement form on March 28, 2007, including the portions where he noted plaintiff's poor ability to sit, stand, walk, lift/carry, climb, and twist/bend/stoop, but noted her ability to "[r]each above shoulder level" and drive "on a limited & as needed only basis." STD Admin. R. 844. He also noted her "ability to perform repetitively" tasks, such as "[f]ine finger movements" and "[e]ye/hand movements," but her inability to push/pull repetitively. STD Admin. R. 844. He further answered the question

9

"In your opinion, why is patient unable to perform job duties?" by writing "Severe fatigue/ weakness/lack[s] focus & concentration," and the question "Patient can work a total of __ hours per day?" by filling in the number "0." STD Admin. R. 844. In response to the question "Have you advised patient to return to work?" Dr. Prater wrote "Unable to return to work/Diagnosis & Treatment Plan as yet to be defined." STD Admin. R. 844.

After receiving additional information from Dr. Prater, including medical records from a March 14, 2007 neurological consultation, MetLife determined that Ms. Novick was prevented from performing the duties of her job due to her protracted weakness and chronic fatigue. Therefore, MetLife extended Ms. Novick's STD claim through April 20, 2007. Defs.' 56.1 Stmt. ¶¶ 72, 80, 88–89.

### C.  Second Extension: STD Benefits Extended Through April 20, 2007

Ms. Novick was informed of the extension of STD benefits through April 20, 2007 by letter, which stated "[t]o consider benefits beyond April 20, 2007, specific information will be needed from your physician." STD Admin. R. 622. By fax dated April 15, 2007, Ms. Booth asked Dr. Prater to submit Ms. Novick's updated medical records and treatment plan. STD Admin. R. 619–20. In response, Dr. Prater submitted his office notes from April 3, 2007 through April 12, 2007. STD Admin. R. 621. These notes stated that on April 3, 2007, Ms. Novick continued to complain of "fatigue all the time" and of "burning @ elbows/ankles/knees/ shoulders off & on," and on April 21, 2007, Ms. Novick "report[ed] worsening stiffness, achiness in ankles & wrists." STD Admin. R. 621. Ms. Novick also advised MetLife via telephone that she had an appointment scheduled with a neurologist on April 17, 2007. Defs.' 56.1 Stmt. ¶ 96.

Ms. Booth reviewed the updated medical information in Ms. Novick's file and determined that it supported Ms. Novick's continuing claim for STD benefits. Defs.' 56.1 Stmt. ¶ 105. Therefore, MetLife extended Ms. Novick's claim for STD benefits through May 11, 2007. Defs.' 56.1 Stmt. ¶ 106. Internally, Ms. Booth also recommended referring Ms. Novick's file to an independent medical peer review consultant after additional medical information was received. Defs.' 56.1 Stmt. ¶ 107.

### D. Third Extension: STD Benefits Extended Through May 11, 2007

Ms. Novick was informed of the extension through May 11, 2007 by letter dated April 27, 2007, stating that "[t]o consider benefits beyond May 11, 2007, specific information will be needed from your physician." STD Admin. R. 614. This letter did not contain any mention of functional abilities, but did state that a "completed Attending Physician Statement must be received by May 18, 2007." STD Admin. R. 614. By fax dated May 17, 2007, Ms. Booth asked Dr. Prater to submit Ms. Novick's updated medical records and treatment plan, including the findings from Ms. Novick's April 17, 2007 neurology consultation. STD Admin. R. 602. On May 17, 2007, Ms. Novick informed Ms. Booth via telephone that there had been no definitive diagnosis after the neurological evaluation, but she was scheduled to see a rheumatologist on June 4, 2007. Defs.' 56.1 Stmt. ¶¶ 112, 116.

### E. Fourth Extension: STD Benefits Extended Through June 8, 2007

Ms. Novick was notified by letter dated May 18, 2007 that "[w]e have reviewed your claim for [STD] disability benefits and have approved your claim from February 7, 2007 through June 8, 2007." STD Admin. R. 613. The letter also stated "[w]e anticipate that you will return

11

to work on your first regularly scheduled workday after June 8, 2007.[7] In the event your disability extends beyond this date, you are required to have your health care provider [submit] specific medical information in order to consider the claim for possible continuation of benefits." STD Admin. R. 613. The letter also contained a list of required information, including that the medical information "should include: . . . 3. Functional abilities." STD Admin. R. 613. It also stated "[i]f no additional information is received by June 15, 2007, your claim will be closed." STD Admin. R. 613.

On May 21, 2007, Dr. Prater sent defendants his office visit notes from January 3, 2007 through May 16, 2007, all of which, except for the entry dated May 16, 2007, had previously been submitted. STD Admin. R. 601–12. In his May 16, 2007 notes, Dr. Prater provided his impression that plaintiff was suffering from "1) [chronic fatigue syndrome] 2) [possible] Fibromyalgia 3) Neuropathy @ hands/feet." STD Admin. R. 612. Dr. Prater also provided Dr. Turel's neurological report. STD Admin. R. 603–08.

On June 11, 2007, four days before the June 15, 2007 claim closure deadline, MetLife telephoned Ms. Novick to ask for information about the rheumatologic examination she had been scheduled to undergo on June 4, 2007, as well as for any other attending physicians' reports. Defs.' 56.1 Stmt. ¶ 159. On June 21, 2007, Ms. Novick provided the name of her

---

7       It is apparent from the record that each of the extensions to Ms. Novick's STD benefits occurred in two to four week blocks ending on a Friday. After the initial approval letter granting STD benefits for four weeks, the first extension letter extended the benefits for two weeks ending on Friday, March 23, 2007; the second extension letter extended the benefits for four weeks ending on Friday, April 20, 2007; and the third extension letter extended the benefits for three weeks ending on Friday, May 11, 2007. In like manner, the final extension letter extended the benefits for another four-week period, thereby arriving at the return-to-work date of June 8, 2007. Similarly, each of the extension letters gave Ms. Novick an additional one-week period beyond the end of benefits, i.e., to the following Friday, to submit additional information in order to continue benefits. This explains why Ms. Novick was given until Friday, June 15, 2007 to submit additional medical information to avoid having the return-to-work date go into effect.

rheumatologist, Dr. Albano-Aluquin, and informed defendant that Dr. Prater would provide all medical information. Defs.' 56.1 Stmt. ¶ 164.

### F. Termination of STD Benefits: June 26, 2007

Despite having received nearly all[8] of the medical information available about Ms. Novick's condition, by letter dated June 26, 2007, MetLife notified Ms. Novick that her benefits had been terminated. STD Admin. R. 600. The sole reason given for the termination of benefits was: "We have previously notified you of the information required for your disability benefit. Our records reflect this has not been provided. Since this has not been received, your claim is being closed as of June 8, 2007." STD Admin. R. 600. The letter did not specify what information had not been provided; in particular, no mention was made of evidence of functional impairment. The letter did, however, include information about how to appeal the decision. STD Admin. R. 600.

### G. Ms. Novick's Request for Reconsideration

On July 1, 2007, Ms. Novick wrote to MetLife stating that "[her] claim has been improperly denied." STD Admin. R. 598. She explained that she "was contacted approximately two weeks ago by [MetLife] requiring information from [Dr. Albano-Aluquin]," at which time she had informed MetLife that all medical information was to be provided by Dr. Prater. STD Admin. R. 598. With her letter, Ms. Novick submitted her most recent office visit note from Dr. Prater dated June 27, 2007. In his note, Dr. Prater observed that Ms. Novick continued to complain of fatigue, difficulty concentrating, confusion, joint pain and stiffness, and neuralgia symptoms, and that there had been no changes in any of her examinations, which he "reviewed

---

[8]    The record indicates that MetLife had not yet received the medical records from Ms. Novick's office visit with Dr. Albano-Aluquin by this point. Defs.' 56.1 Stmt. ¶ 164.

[with her] @ length." STD Admin. R. 599.

> By letter dated July 23, 2007, MetLife informed Ms. Novick that
>
> [a] Clinical Specialist reviewed an office visit note from Dr. Prater dated 06/27/2007 and a neurology consult dated 04/17/2007, Dr. Turel. There was no documentation of medical findings to support a functional impairment that would prevent you from performing the duties of your occpation [sic] from Dr. Prater or Dr. Turel. The exam findings were essentially negative by both physicians. Both physicians report that you have reported fatigue, joint pain, joint stiffness as well as symptoms of neuralgia, however, there were no documented medical findings to support your self reported symptoms. In fact, Dr. Turel indicated: "examination actually looked fairly stable. While she had symptoms of diffuse discomfort of dyesthesia [sic], I could not account for them." His exam was negative. Dr. Prater did not provide any exam findings, but indicated the exam findings had not changed. There were no significant abnormal findings found in any of the medical documentation provided by Dr. Prater.

STD Admin. R. 580, 588, 595. The letter also stated that Ms. Novick's claim would be reconsidered if she provided "documentation of medical findings that support a functional impairment that prevents you from performing the duties of your occupation." STD Admin. R. 580, 588, 595.

MetLife then received a letter from Dr. Prater dated July 31, 2007, noting that Ms. Novick "continue[d] with multiple symptoms," but "had extensive evaluation which thus far ha[d] revealed no specific diagnosis to account for all these issues." STD Admin. R. 579. As to functional impairment, Dr. Prater also stated that her "symptoms have prevented her from returning to work and she remains disabled. . . . [I]t does not appear that she will be able to return to work in the foreseeable future." STD Admin. R. 579.

By letter dated August 16, 2007, MetLife advised Ms. Novick that it had received the additional medical information submitted by Dr. Prater, and stated, "[i]f your intent is to request a review of your claim denial, you must follow the review procedures as explained in our letter dated 7/23/07." STD Admin. R. 574.

14

### H. Ms. Novick's Administrative Appeal

On August 21, 2007, Ms. Novick asked MetLife to reopen her disability claim, stating

that she was "very ill and unable to return to work" and that "[a]dditional documentation was

provided to you by Dr. John Prater." STD Admin. R. 576, 578. The "documentation" refers to

Dr. Prater's letter dated July 31, 2007, stating that Ms. Novick "remains disabled . . . [and will

not] be able to return to work in the foreseeable future." STD Admin. R. 579. Ms. Novick's

letter was treated as an appeals letter and her STD claim was referred to the MetLife Disability

Appeals Unit. Defs.' 56.1 Stmt. ¶ 212.

In support of her appeal, Ms. Novick submitted an August 3, 2007 office visit note from

Dr. Eskow, an infectious disease physician, reporting that Ms. Novick "is presently unable to

work in any capacity due to her illness." STD Admin. R. 568, 572. By letter dated September

11, 2007, MetLife acknowledged receipt of Ms. Novick's appeal and advised her that any

additional information that she wanted considered in support of her appeal had to be submitted

within 180 days. STD Admin. R. 570.

Mr. Novak, plaintiff's attorney, then advised MetLife that he had been retained to assist

Ms. Novick with her administrative appeal. STD Admin. R. 559. Mr. Novak submitted to

MetLife a copy of a narrative report dated October 10, 2007 from Lyme Disease Specialist, Dr.

Horowitz, which detailed the findings of a September 27, 2007 office visit. STD Admin. R. 496,

562. In this letter, Dr. Horowitz stated,

> Currently [Ms. Novick] is only functioning at an estimated 35% of normal.
> Because of her multiple chronic fibromyalgia-like symptoms, her cognitive
> impairments, and her severe neuralgia the patient is disabled at this time. . . . It is
> our opinion that Ms. Novick is unable to uphold the responsibilities of her job or
> of any gainful employment at this time, and that her current condition is the result
> of Lyme disease.

STD Admin. R. 496, 562.

Thereafter, MetLife referred Ms. Novick's file to Dr. Payne, an Independent Medical Record Peer Review Consultant specializing in rheumatology and internal medicine.  In his November 19, 2007 report, Dr. Payne noted that he had reviewed Ms. Novick's medical records and had an extensive conversation with Dr. Horowitz, and "[i]t was [Dr. Horowitz's] thinking that [Ms. Novick] probably had Lyme's disease with a prolonged neurological manifestation.  He noted an extensive array of clinical data and clinical trial data as well as published information in regard to this diagnosis."  STD Admin. R. 528–29, 550–51.  Dr. Payne then stated that Dr. Horowitz "did not describe specific objective clinical findings with respect to Ms. Novick's physical examination in regard to limitation[s] that she had as a result of this condition."  STD Admin. R. 529, 551.

> Dr. Payne then concluded that
>
> > Following a careful and thorough review of all the medical record data, there are no objective findings in the medical records that would necessitate the placement of restrictions or limitations on activities.  Although she may in fact have a manifestation of chronic . . . Lyme disease, there are no findings that would lead this reviewer to state that this process is producing any degree of an inability to work.

STD Admin. R. 530, 552.  Dr. Payne made this statement even though he had apparently seen Dr. Prater's July 31, 2007 letter and Dr. Horowitz's October 10, 2007 letter.  STD Admin. R. 579 (Ms. Novick "remains disabled . . . [and] will [not] be able to return to work in the foreseeable future."); STD Admin. R. 496, 562 ("It is our opinion that Ms. Novick is unable to uphold the responsibilities of her job or of any gainful employment at this time.").

On November 26, 2007, MetLife sent Dr. Payne's report to Ms. Novick's three attending physicians, Dr. Prater, Dr. Horowitz, and Dr. Albano-Aluquin, requesting "comments on this report, specifically addressing but not limited to, Ms. Novick's impairments, restrictions and/or limitations."  STD Admin. R. 523, 525, 527.  The letter also stated that "[i]f you are not in

16

agreement with this report, please submit clinical evidence in support of your conclusions." STD Admin. R. 523, 525, 527. MetLife received no response from Ms. Novick's doctors, except a notification from Dr. Albano-Aluquin's office that she was presently on maternity leave. STD Admin. R. 521, 818.

By letter dated December 3, 2007, Mr. Jennings, another attorney, notified MetLife that he had been retained to handle Ms. Novick's claims. STD Admin. R. 451–55, 476–80. With his letter, Mr. Jennings submitted: Ms. Novick's Declaration dated November 30, 2007; Dr. Horowitz's letter dated October 10, 2007, which had previously been submitted by Mr. Novak; a consultation note from Dr. Horowitz's office dated September 27, 2007 and laboratory testing results, which had also been previously submitted; Dr. Prater's letter dated July 31, 2007, which had also been previously submitted; a November 28, 2007 office visit note from Dr. Horowitz's office, reporting, "[o]verall, although her progress is slow she is showing benefit with her current treatment. However, her symptoms are still significant and disabling: she is not at all close to being able to resume the responsibilities of her previous job"; and a December 1, 2007 letter from Dr. Horowitz's office, stating, "[i]t is my opinion that Ms. Novick is indeed disabled by her current symptoms and is not capable of returning to her previous job." STD Admin. R. 481–94; 496, 562; 498–502, 544–48; 504–11; 513, 514, 579; 519; 516–18. Mr. Jennings later submitted Dr. Horowitz and Nurse Fallon's joint "Expert Report" dated January 11, 2008, in which they write

> It is well documented that patients who struggle with chronic illness from Lyme disease often present with a clinical picture that reflects significantly high symptomatic impairment (often with symptoms such as fatigue, cognitive difficulties, joint and muscle pains), but the physical findings on examination can be unimpressive. Ms. Novick classically fits this picture. . . . Although the patient has shown some improvement with antimicrobial therapy she remains severely symptomatic and is still disabled.

STD Admin. R. 204. Along with the Report, Mr. Jennings also submitted Dr. Horowitz's

Curriculum Vitae; Nurse Fallon's telephone consultation note dated January 14, 2008;

and twenty-seven articles and publications regarding Lyme disease supplied by Dr.

Horowitz. STD Admin. R. 208–11; 206–07; 212–441.

       After all of the information submitted in support of her appeal had been received, Ms.

Novick's file was again referred to Dr. Payne for a second Independent Medical Record Peer

Review. Defs.' 56.1 Stmt. ¶ 305. By letter dated February 12, 2008, MetLife informed Mr.

Jennings that MetLife had "reviewed [Ms. Novick's] complete claim" and that "[a]ll medical

information in the claim file has also been reviewed by an Independent Physician Consultant,"

who "*does not disagree that Ms. Novick may have chronic Lyme disease.* However, the

consultant concludes that there are no clinical findings that would evidence restrictions and

limitations on Ms. Novick's activities." STD Admin. R. 195 (emphasis added). MetLife stated

that "*[w]hile we do not dispute Ms. Novick's diagnosis,* the available information does not

demonstrate that she was unable to perform the essential duties of her occupation as a business

systems analyst as of June 9, 2007. Therefore, she does not satisfy the plan's definition of

disability. As such, the previous claim determination was appropriate, and remains in effect."

STD Admin. R. 196 (emphasis added).

## II.    Ms. Novick's LTD Benefits Claim

       On July 25, 2008, Ms. Novick called MetLife to request "a LTD packet so she can file for

LTD benefits." STD Admin. R. 168. On July 30, 2008, MetLife informed Ms. Novick via

telephone that "[s]he has not been paid STD max[imum] benefits and that we will not consider

any LTD benefits unless STD benefits are re-instated and paid to max[imum] duration and

medical information support on going disability." STD Admin. R. 168–169. Nonetheless,

pursuant to Ms. Novick's request, MetLife sent her the requested LTD application package, but stated in the cover letter: "Per our conversation on July 30, 2008, [LTD] benefits cannot be considered until your [STD] claim has been paid to the max duration (in your case that would be August 10, 2007) and we must have medical documentation that would support your inability to do your job with MetLife." STD Admin. R. 171.

Despite being so advised, Ms. Novick submitted an application for LTD benefits by letter dated May 26, 2009. LTD Benefits Administrative Claim File, Hallford Dec. Ex. C, at 925–1111 ("LTD Admin. R."). MetLife received Ms. Novick's LTD application packet on May 27, 2009. Pl.'s 56.1 Stmt. ¶ 76. MetLife neither acknowledged receipt of the application prior to the filing of suit, nor responded to the LTD Application in any way. Pl.'s 56.1 Stmt. ¶ 78.

## LEGAL STANDARD

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quoting *Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012)). In assessing whether summary judgment is proper, the court must construe "the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in [that party's] favor." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

## APPLICABLE STANDARD OF REVIEW

"Although it is a 'comprehensive and reticulated statute,' ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108–09 (1989) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980)). Therefore, "[i]n determining the appropriate standard of review for actions under § 1132(a)(1)(B), we are guided by principles of trust law." *Id.* at 111. Hence, "[c]onsistent with established principles of trust law," the Supreme Court has held "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115.

When a claim administrator demonstrates that it possesses such discretionary authority, "[t]rust principles make a deferential standard of review appropriate." *Id.* at 111; *see, e.g.,* *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 137 n.2 (2d Cir. 2010) ("In an action under 29 U.S.C. § 1132(a)(1)(B), the district court conducts arbitrary-and-capricious review of ERISA-fund administrators' discretionary decisions."). In other words, "[w]hen an employee benefit plan grants a plan fiduciary discretionary authority to construe the terms of the plan, a district court must review deferentially a denial of benefits challenged under § 502(a)(1)(B). The court may reverse only if the fiduciary's decision was arbitrary and capricious." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1070 (2d Cir. 1995) (citing *Firestone*, 489 U.S. at 115; *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995)).

Here, the Plan granted MetLife "the discretionary authority to interpret the terms of the Plan and to determine entitlement to Plan benefits in accordance with the terms of the Plan," and

20

"[a]ny interpretation or determination made pursuant to such discretionary authority shall be given full force and effect." STD Benefits Summary Plan Description, Hallford Dec. Ex. A, at 41 ("STD SPD"); *see also* LTD Benefits Summary Plan Description, Hallford Dec. Ex. A, at 74 ("LTD SPD"). Furthermore, the Plan grants the Plan Administrator "full power and discretion to resolve all issues concerning eligibility, status, entitlement to benefits, and any other interpretations under the MetLife Options Plus program" with respect to both STD and LTD coverage. STD SPD 19; LTD SPD 58. This language has been held to vest MetLife with full discretionary authority. *See, e.g., Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 79 (2d Cir. 2009); *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008). Therefore, a deferential arbitrary-and-capricious standard of review is applicable in this case.[9]

Under the arbitrary-and-capricious standard, a court cannot "overturn a decision to deny or terminate benefits unless 'it was without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Fuller v. J.P. Morgan Chase & Co.*, 423 F.3d 104, 107 (2d Cir. 2005) (quoting *Pagan*, 52 F.3d at 442). "Substantial evidence" is defined as "such evidence that a reasonable mind might accept as adequate to support the conclusion reached . . . . [It] requires more than a scintilla but less than a preponderance." *Miller*, 72 F.3d at 1072 (citation omitted).

Where, as here, the administrator of an ERISA plan "both evaluates claims for benefits and pays benefits" there is a "structural" conflict of interest. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). When a plan administrator "is operating under a conflict of interest, that conflict must be weighed as a 'factor[] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187 cmt. d (1959)). The

---

[9]     "Ms. Novick agrees that the Court must review defendants' termination of her STD benefits and the denial of her appeal under an arbitrary and capricious standard of review." Pl.'s Consol. Mem. in Supp. of Mot. for Summ. J. & in Opp. to Defs.' Mot. for Summ. J. 5 (ECF Dkt. No. 60).

Supreme Court has determined "that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case." *Glenn*, 554 U.S. at 108 (citing *Firestone*, 489 U.S. at 115). The Second Circuit, however, has held that "[n]o weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." *Durakovic*, 609 F.3d at 140 (citing *Hobson*, 574 F.3d at 83).

## DISCUSSION

### I.    Defendants' Motion to Strike

"[A] district court's review under the arbitrary and capricious standard is limited to the administrative record." *Miller*, 72 F.3d at 1071; *see also Rund v. JPMorgan Chase Grp. Long Term Disability Plan*, No. 10 Civ. 5284, 2012 U.S. Dist. LEXIS 48525, at *3 (S.D.N.Y. Mar. 30, 2012) ("When a court reviews an administrator's discretionary decision determining eligibility for benefits under a discretionary standard of review, the court may not consider evidence outside of the administrative record."); *Maskara v. First Unum Life Ins. Co.*, No. 03 Civ. 498, 2004 U.S. Dist. LEXIS 13002, at *2 (S.D.N.Y. July 13, 2004) ("Judicial review of defendant's denial of ERISA plan benefits to plaintiff . . . is concededly limited to a review of the administrative record.") (citing *Miller*, 72 F.3d at 1071). "The administrative record consists of the documents before the claims administrator when the decision regarding benefits was made." *Rund*, 2012 U.S. Dist. LEXIS 48525, at *3 (citing *Krizek v. Cigna Group Ins.*, 345 F.3d 91, 97 (2d Cir. 2003)).

On February 24, 2012, defendants moved to strike what they claimed were improper extra-record submissions included with plaintiff's summary judgment motion. Specifically,

22

plaintiff included documents that were not contained in the administrative record, including an affidavit dated January 31, 2012, a Social Security Administration ("SSA") Notice of Decision dated February 9, 2010, and a SSA Notice of Award dated March 25, 2010. Defs.' Mem. in Supp. of Mot. to Strike 1 (ECF Dkt. No. 67) ("Defs.' Mot. to Strike"). According to defendants, these documents were dated years after MetLife rendered its final determination on administrative appeal, and therefore are not part of the administrative claim file pertaining to Ms. Novick's claim for STD benefits. Defs.' Mot. to Strike 1. As such, defendants argue that this court cannot consider these materials in determining whether MetLife's decision-making, resulting in the termination of plaintiff's STD benefits, was arbitrary and capricious. Defendants further argue that, to the extent that the court considers plaintiff's claim for LTD benefits under a de novo review, no "good cause" exists for this court to consider these extra-record submissions because they are irrelevant to the question of whether Ms. Novick was disabled under the Plan's terms, and therefore entitled to these benefits.

In response, plaintiff argues that the information in the extra-record submissions is necessary, and asks the court to deny defendants' Motion to Strike in its entirety, or strike only paragraph one of the affidavit, which notes the correct date of Ms. Novick's tick bite. Pl.'s Mem. in Opp. to Defs.' Mot. to Strike 11 (ECF Dkt. No. 69) ("Pl.'s Mem."). In support of her position, plaintiff argues that (1) the court is permitted to consider extra-record evidence that pertains to an insurer's conflict of interest; (2) the extra-record submissions "provide the factual basis for the proper calculation of her STD benefit damages in the event that she prevails on her Motion for Summary Judgment"; and (3) the court can strike paragraph one of the challenged affidavit if it believes it is unnecessary because plaintiff concedes that the correct date of her

23

being bitten by a tick does not relate to a conflict of interest or the collection of damages. Pl.'s Mem. 4, 8, 9.

The court finds that, because Ms. Novick's STD benefits claim must be reviewed under an arbitrary-and-capricious standard of review, its review is confined to the administrative record. While plaintiff argues that the court is permitted to consider extra-record evidence that relates to an insurer's conflict of interest, the challenged submissions do not even suggest such a conflict. The Supreme Court has described evidence that "an insurance company administrator has a history of biased claims administration" and evidence demonstrating whether "the administrator has taken active steps to reduce potential bias and to promote accuracy," as the type of extra-record evidence pertaining to an insurer's conflict of interest that should be considered. *Glenn*, 554 U.S. at 117. Neither Ms. Novick's affidavit nor the SSA documents constitute this type of evidence.

Further, while plaintiff insists that the extra-record submissions are necessary for the calculation of damages should she prevail on her STD claim, it is apparent that the parties are better equipped than the court to calculate the proper damages and offsets,[10] if and when this need arises. The proffered information is unnecessary to the court's resolution of the parties' cross motions for summary judgment.

Next, plaintiff insists the court is permitted to consider extra-record submissions under the de novo standard of review, which Ms. Novick contends is applicable to her claim for LTD benefits. As will be shown below, however, the court need not review the LTD benefits claim

---

[10]     Under the terms of the STD Plan, "disability benefits are reduced [or offset] by the amount of disability benefits for which you are eligible through other sources . . . includ[ing] Social Security." STD SPD 43.

24

because MetLife failed to render any decision on the application, and therefore the LTD application must be remanded to defendants for consideration and a response.

Accordingly, defendants' motion to strike is granted.

## II.    Cross-Motions for Summary Judgment

"ERISA provides 'a panoply of remedial devices' for participants and beneficiaries of benefit plans." *Firestone*, 489 U.S. at 108 (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985)).  In particular, section 1132(a)(1)(B) is ERISA's civil enforcement provision which defines the "[p]ersons empowered to bring a civil action." 29 U.S.C. § 1132(a).  Under these provisions, "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

Here, plaintiff seeks a reinstatement of her claim status for purposes of both STD and LTD benefits under the Plan; an award of all retroactive STD and LTD benefits currently due and owing, plus statutory interest; and permission for plaintiff's attorney to petition the court for attorney's fees. Pl.'s Consol. Mem. in Supp. of Mot. for Summ. J. & in Opp. to Defs.' Mot. for Summ. J. 31 (ECF Dkt. No. 60) ("Pl.'s Consol. Mem.").

Both parties agree that MetLife's decision-making process as to Ms. Novick's STD benefits must be reviewed under an abuse-of-discretion standard of review.  Hence, the issue is whether MetLife's decisions to terminate Ms. Novick's STD benefits and deny her appeal were unlawful because they were "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan*, 52 F.3d at 442 (citations omitted).  Thus, the question before the court is whether MetLife acted arbitrarily and capriciously when it terminated Ms. Novick's STD

25

benefits and denied her appeal on the ground that "the information required for [Ms. Novick's] disability benefit . . . ha[d] not been provided." STD Admin. R. 600.

Under the terms of Ms. Novick's STD benefits plan,

> *"Disabled"* or *"Disability"* means that due to illness or accidental injury:
> - You are receiving appropriate care and treatment from a doctor on a continuing basis; and
> - You are unable to earn more than 80% of your pre-disability earnings at your own occupation for any employer in your local economy.
>
> Your loss of earnings must be a direct result of your illness or accidental injury.

STD SPD 22. A Plan beneficiary will receive STD benefits provided that (1) his or her "[d]isability has been approved," (2) the "[d]isability has been continuous," and (3) the beneficiary has been "under a doctor's care and [is] receiving active medical treatment for the disabling condition." STD SPD 27. The beneficiary "will receive this benefit for as long as [his or her] Disability is approved and continues, to a maximum of 26 weeks." STD SPD 28.

### A.  *MetLife's Decisions to Terminate Ms. Novick's STD Benefits and Deny Her Administrative Appeal Were Unreasonable*

By her motion, plaintiff challenges MetLife's determinations to (1) terminate her STD benefits for the reasons provided in MetLife's June 26, 2007 letter; (2) deny her request for reconsideration as detailed in MetLife's July 23, 2007 letter; and (3) deny her administrative appeal for the reasons stated in MetLife's February 12, 2008 letter.

In the initial termination letter of June 26, 2007, the sole reason given for the termination of benefits was: "We previously notified you of the information required for your disability benefit. Our records reflect this has not been provided. Since this has not been received, your claim is being closed as of June 8, 2007." STD Admin. R. 600.

In the July 23, 2007 letter, which upheld the initial termination after Ms. Novick's

request for reconsideration, MetLife found that "[a]fter conducting a complete review of your

file, we have concluded the medical information supplied does not support your continued

eligibility for [STD] benefits beyond 6/11/07." STD Admin. R. 580, 588, 595. The letter

included the definition of "disability" from Ms. Novick's STD benefit plan document, and

reported that

> A Clinical Specialist reviewed an office visit note from Dr. Prater dated
> 06/27/2007 and a neurology consult dated 04/17/2007, Dr. Turel. There was no
> documentation of medical findings to support a functional impairment that would
> prevent you from performing the duties of your occpation [sic] from Dr. Prater or
> Dr. Turel. The exam findings were essentially negative by both physicians. Both
> physicians report that you have reported fatigue, joint pain, joint stiffness as well
> as symptoms of neuralgia, however, there were no documented medical findings
> to support your self reported symptoms. In fact, Dr. Turel indicated:
> "examination actually looked fairly stable. While she had symptoms of diffuse
> discomfort of dyesthesia [sic], I could not account for them." His exam was
> negative. Dr. Prater did not provide any exam findings, but indicated the exam
> findings had not changed. There were no significant abnormal findings found in
> any of the medical documentation provided by Dr. Prater.

STD Admin. R. 580, 588, 595.

Finally, after conducting the administrative appeal, MetLife notified Ms. Novick that its

termination decision was upheld on appeal in the February 12, 2008 letter. This letter again

included the definition of "disability" under the STD benefits plan, and stated that "[t]he

previous determination was upheld upon appeal review for the following reasons:" (1) the STD

benefits were "terminated due to medical [information] not supporting disability under the Plan";

(2) all exams and tests on file were negative or not correlated clinically;[11] (3) "According to [Dr.

---

[11]     In particular, the February 12, 2008 letter noted that

Ms. Novick's cervical spine MRI revealed modest degenerative change. An MRI
of the brain in March 2007 revealed a few nonspecific foci in the subcortical
white matter. A lumbar puncture was reported to be normal. Most of the lab

Payne], the medical information on file does not validate functional limitations.  [Dr. Payne did]

not disagree that Ms. Novick may have chronic Lyme disease.  However, [Dr. Payne] concludes

that there are no clinical findings that would evidence restrictions and limitations on Ms.

Novick's activities"; and (4) "[w]hile we do not dispute Ms. Novick's diagnosis, the available

information does not demonstrate that she was unable to perform the essential duties of her

occupation as a business systems analyst as of June 9, 2007.  Therefore, she does not satisfy the

plan's definition of disability.  As such, the previous claim determination was appropriate, and

remains in effect."  STD Admin. R. 195–96.

     The court finds that these decisions were arbitrary and capricious.  That is, MetLife's

determination that Ms. Novick did not provide substantial evidence to support her disability was

arbitrary and capricious, and MetLife's failure to apprise Ms. Novick of the information required

to support her STD claim was unreasonable.

### 1.  *MetLife's Determination That Ms. Novick Did Not Provide Substantial Evidence to Support Her Disability Was Arbitrary and Capricious*

     MetLife's initial termination of Ms. Novick's STD benefits, as described in its letter

dated June 26, 2007, was arbitrary and capricious, as was MetLife's subsequent decision to

uphold this termination after reconsideration, as described in its July 23, 2007 letter. The court

reaches this holding based on its conclusion that, despite MetLife's findings to the contrary,

substantial evidence does not support a finding that Ms. Novick was not disabled.

---

work in the file was reported to be within normal limits.  Dr. Horowitz reported
that Ms. Novick's Western Blot Lyme serology was positive due to one of the
unusual bands being positive, although the summation test was reported to be
negative by CDC criteria.  The examinations on file indicated tender points on
evaluation.  No synovitis or extra-articular manifestation[s] were noted in the
examinations.  Ms. Novick was treated with medications for her condition.

STD Admin. R. 195.

Similarly, MetLife's denial of Ms. Novick's administrative appeal for lack of supporting medical information was also arbitrary and capricious. MetLife's reason for denying the administrative appeal was not the result of a dispute as to Ms. Novick's diagnosis, but, rather, because "the available information [did] not demonstrate that [Ms. Novick] was unable to perform the essential duties of her occupation as a business systems analyst as of June 9, 2007." STD Admin. R. 196. Again, the court finds that substantial evidence did not support MetLife's conclusion. In other words, MetLife's three determinations were unreasonable and were not supported by substantial evidence.

First, throughout the process, Ms. Novick provided MetLife with all of her medical records. Even a cursory reading of these records compels the conclusion that substantial evidence on the record supports plaintiff's claimed disability. For example, Ms. Novick's treating physicians' conclusions from February 2007 through January 2008 regarding her disability constitute such evidence. *See* STD Admin. R. 867, 872 ("Patient can work a total of 0 hours per day. She is unable to work now because of severe fatigue."); STD Admin. R. 849 ("Still unable to work."); STD Admin. R. 844 ("Unable to perform her job because of chronic fatigue and difficulties with focus/concentration."); STD Admin. R. 513, 514, 569, 579, 587 ("Unfortunately, her constellation of symptoms have prevented her from returning to work and she remains disabled. As this is a chronic condition dating back to 1/07, it does not appear that she will be able to return to work in the foreseeable future."); STD Admin. R. 568, 572 ("[s]he is presently unable to work in any capacity due to her illness."); STD Admin. R. 564 ("She continues to be unable to work in any capacity due to her illness. . . . I would like to stress that her clinical presentation is consistent with a diagnosis of [L]yme disease with associated neurological effects. . . . I do not anticipate that she will be able to return to work for at least the

29

next three month period."); STD Admin. R. 500, 540, 546 ("Because of her multiple chronic fibromyalgia-like symptoms and her cognitive impairments and her severe neuralgia the patient is disabled at this time."); STD Admin. R. 496, 562 ("She is severely impaired by her symptoms which include: chills, sweats, severe fatigue, joint pains which affect her elbows, wrists, hands fingers, ankles, and knees, stiffness, muscle twitching, significant burning pains in her body, significant brain fog and confusion, difficulty with concentrating and reading, poor memory, and mood swings. Currently she is only functioning at an estimated 35% of normal. Because of her multiple chronic fibromyalgia-like symptoms, her cognitive impairments, and her severe neuralgia the patient is disabled at this time. . . . It is our opinion that Ms. Novick is unable to uphold the responsibilities of her job or of any gainful employment at this time, and that her current condition is the result of Lyme disease."); STD Admin. R. 460, 464, 465, 470, 519 ("[H]er symptoms are still significant and disabling: she is not at all close to being able to resume the responsibilities of her previous job."); STD Admin. R. 447–48, 457–58, 462–63, 468–69, 517–18 ("It is my opinion that Ms. Novick is indeed disabled by her current symptoms and is not capable of returning to her previous job."); STD Admin. R. 202 ("[S]he is clearly disabled by her panoply of symptoms."); STD Admin. R. 205 ("[I]t is our opinion within a reasonable degree of medical certainty that Ms. Novick is disabled by her current symptoms and is not capable of returning to her previous job. . . . Her impairments can easily be expected to persist for another year or longer and the prognosis for significant recovery is guarded at this point."); STD Admin. R. 206 ("There should be no doubt that the symptoms that she is experiencing are both real and disabling. At this point she is likely facing at least a year of therapy before being able to significantly recover her health and the prognosis must be considered as guarded.").

Thus, all of the physicians who examined Ms. Novick and expressed an opinion as to whether or not she was disabled found her to be disabled.  Under the substantial evidence standard of review, "a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).  Here, all of the record evidence indicates that Ms. Novick was disabled and there is no record evidence that she was not.  While MetLife may have wished that other tests be performed to demonstrate disability, defendants never asked for these tests, but, rather, chose to make their determination based on information that was not on the record.  Put another way, MetLife chose to rely on conclusions reached by Dr. Payne, a doctor who never examined Ms. Novick and whose opinion was founded on an absence of record evidence, even though Ms. Novick's treatment physicians who offered opinions as to whether or not she was disabled, concluded that she was in fact disabled.  As the determination that Ms. Novick was not disabled is not supported by substantial record evidence, the court finds that it was unreasonable for MetLife to deny Ms. Novick's application for STD benefits, her request for reconsideration, and her internal appeal.

### 2. *MetLife's Failure to Apprise Ms. Novick of the Information Required to Support Her STD Claim Was Unreasonable*

MetLife's determinations were also unreasonable because defendants failed to adequately inform Ms. Novick of the type of information that was needed to continue her STD benefits.

31

As noted, each of Ms. Novick's treating physicians who expressed an opinion[12] found her to be disabled. If MetLife wanted something else by way of tests or specific explanations, it could have said so in a manner that would have apprised Ms. Novick of exactly what was needed.

The requirement that an applicant understand what is needed to support a claim is clearly expressed in the ERISA regulations. *See* 29 C.F.R. § 2560.503-1(g)(1) (2008) ("[T]he plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. . . . The notification shall set forth, *in a manner calculated to be understood by the claimant*—(i) The specific reason or reasons for the adverse determination; (ii) Reference to the specific plan provisions on which the determination is based; (iii) *A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary*." (emphasis added)); *see also* 29 U.S.C. § 1022(a) ("The summary plan description . . . shall be written *in a manner calculated to be understood by the average plan participant*, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." (emphasis added)).

As any reading of MetLife's three determination letters described above reveals, MetLife did not provide Ms. Novick with a clear description of the information it required in a manner calculated to be understood by a layperson. That is, if MetLife desired specific testing or analysis as to functional impairment, it should have said so. Indeed, even before the court,

---

[12]    Only Dr. Albano-Aluquin, Dr. Garg, and Dr. Turel did not conclude that Ms. Novick was disabled and did not address her ability or inability to work. STD Admin. R. 565–68, 583–586, 591–94; STD Admin. R. 839–40; STD Admin. R. 603–08. It is important to note, however, that Dr. Albano-Aluquin and Dr. Turel appear to have only examined Ms. Novick on one occasion, while Dr. Garg saw her once in the hospital, and once after she was released. Her other treating physicians, most especially Dr. Prater and Dr. Horowitz, on the other hand, continuously reported Ms. Novick's debilitating symptoms over time.

32

MetLife has not made it clear what it wanted.  It is apparent that plaintiff's treating physicians ordered the tests that they believed would help with her diagnosis and treatment, without guidance from MetLife regarding the types of tests the company wanted.  Even though Dr. Payne, who was hired by MetLife to conduct a review, had an extensive telephone conversation with Dr. Horowitz (who on October 10, 2007 stated that "Ms. Novick is unable to uphold the responsibilities of her job or of any gainful employment at this time, and . . . her current condition is the result of Lyme disease"), Dr. Payne never asked Dr. Horowitz to conduct any specific tests, nor does he appear to have asked Dr. Horowitz about functional impairment at all.

Because MetLife acted arbitrarily and capriciously when it (1) terminated Ms. Novick's STD benefits, (2) upheld the determination after reconsidering her claim, and (3) upheld the termination after conducting an administrative appeal, Ms. Novick is to receive the twenty-six weeks of STD benefits under the terms of the Plan. *See Zervos v. Verizon N.Y.*, 277 F.3d 635, 648 (2d Cir. 2002) ("[A] remand of an ERISA action seeking benefits is inappropriate 'where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable.'" (quoting *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 51 n.4 (2d Cir. 1996)).

### B. *MetLife Failed to Process Ms. Novick's LTD Claim & Provide Notice of Its Determination*

In its introduction, the LTD Benefits Summary Plan Description states that the LTD "Plan is intended to replace some of your income if you continue to be Disabled and unable to work after receiving compensation continuance and/or temporary disability benefits for 26 weeks."  LTD SPD 60.  Furthermore, under the "overview of how the plan works," it states that "[LTD] Benefits begin after you've been Disabled beyond the period of time covered by

compensation continuance and/or temporary disability benefits.  (Refer to the Short Term

Disability SPD for further details.)."  LTD SPD 60.  Under the section entitled "HOW THE

PLAN WORKS," moreover, it states that

> If you meet all the requirements of the LTD Plan, the Plan pays monthly benefits
> if you have a serious illness or injury and continue to be Disabled beyond the
> expiration of STD benefits. . . .
>
> For the first 26 . . . weeks of an illness or injury . . . , you may receive
> compensation continuance and/or temporary disability benefits.  If you remain
> Disabled after 26 . . . weeks after receiving all of your compensation continuance
> and/or temporary disability benefits, LTD benefits may commence being paid on
> a monthly basis if you meet all requirements of the LTD Plan.

LTD SPD 65.  Finally, under the instructions for "FILING A CLAIM FOR BENEFITS"

it states that "[y]ou will be provided a [LTD] packet . . . , which will include a claim form

and will describe all the documentation needed to file your claim.  You should file the

claim after four months of disability."  LTD SPD 74.  Additionally, in the STD SPD,

under the heading "If Your Disability Extends Beyond 26 Weeks," it states "You may be

eligible for long term disability benefits if your Disability is approved and continues

beyond 26 weeks.  (See the Long Term Disability SPD for further details)."  STD SPD

29.

Defendants insist that plaintiff was not entitled to an award of LTD benefits as a matter of

law because she did not remain disabled under the terms of the Plan during the full twenty-six

week period.  The Plan states that LTD "is intended to replace some of your income if you

continue to be Disabled and unable to work after receiving compensation continuance and/or

temporary disability benefits for 26 weeks."  LTD SPD 60.  Moreover, the Plan states that

"[LTD b]enefits begin after you've been Disabled beyond the period of time covered by

compensation continuance and/or temporary disability benefits.  (Refer to the Short Term

34

Disability SPD for further details.)." LTD SPD 60. For this reason, MetLife insists that Ms. Novick never became eligible for LTD benefits, and therefore it did not process her claim.

Plaintiff counters that defendants' arguments are barred by the law of the case. Pl.'s Consol. Mem. 9. Plaintiff states that in denying defendants' motion to dismiss, the court "held that defendants' LTD SPD was ambiguous and that no condition precedent requiring the receipt of 26 weeks of STD benefits may be read into it," and therefore defendants are barred from arguing that a condition precedent exists. Pl.'s' Mem. 9. As indicated by defendants, however, the court specifically noted that it was "not here stat[ing] that Novick necessarily *was* entitled to LTD benefits or that a prerequisite to LTD benefits of twenty-six weeks of STD benefits definitely *did not* exist. That is not the task on the present motion and the Court need not reach the issue." *Novick v. Metro. Life Ins. Co.*, 764 F. Supp. 2d 653, 668 (S.D.N.Y. Feb. 10, 2011).

The court finds that defendants' argument that plaintiff was ineligible for LTD benefits because she failed to meet the twenty-six week condition precedent was not barred by the law of the case. Indeed, the court specifically reserved judgment on this point. Under any reading of the Plan, the twenty-six week condition precedent appears to exist, as it is referenced at several points in the Summary Plan Document, which characterizes LTD benefits as those benefits that become available when a claimant has exhausted STD benefits. Additionally, Ms. Novick received actual notice of the twenty-six week condition precedent both by telephone and by letter. Indeed, the letter which accompanied the LTD packet stated "[p]er our conversation on July 30, 2008, [LTD] benefits cannot be considered until your [STD] claim has been paid to the max duration (in your case that would be August 10, 2007) and we must have medical documentation that would support your inability to do your job with MetLife." STD Admin. R. 171.

This twenty-six week condition precedent, however, does not explain why Ms. Novick received no response whatsoever from MetLife. Indeed, under the ERISA regulations, the claim administrator is required to "notify the claimant . . . of the plan's adverse benefit determination within a reasonable period of time, but not later than 45 days after receipt of the claim by the plan." 29 C.F.R. § 2560.503-1(f)(3)). Here, no such formal notification was sent to Ms. Novick stating that her LTD benefits claim was denied due to the twenty-six week condition precedent, or for some other reason. In addition, because the court has now granted Ms. Novick's STD benefits claim for the entire twenty-six week period, a response from MetLife is clearly required because Ms. Novick now meets the claimed condition precedent.

Because MetLife took no action with respect to Ms. Novick's LTD benefit application, there is nothing here for the court to review. It is not the task of the "federal district courts [to] function as substitute plan administrators," and therefore the LTD claim must be remanded to MetLife so it may render a decision on Ms. Novick's claim. *Miller*, 72 F.3d at 1071 (citation omitted). Otherwise, the court would be tasked with reviewing Ms. Novick's medical submissions to determine whether the medical evidence indicates that Ms. Novick was disabled pursuant to the Plan's terms.

## III.    Attorney's Fees

By her motion, Ms. Novick also seeks permission for plaintiff's attorney to petition the court for attorney's fees. Pl.'s Consol. Mem. 31. In an ERISA action, an application for attorney's fees is governed by 29 U.S.C. § 1132(g), which provides that "[i]n any action . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." In support of such a request, a litigant "must show 'some degree of success on the merits' before a court may award attorney's fees under § 1132(g)(1)."

36

*Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2158 (2010) (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983)).  Here, because Ms. Novick has prevailed on her STD benefits claim, plaintiff may make an application for attorney's fees.       .

### CONCLUSION and ORDER

For the reasons set forth above, defendants' motion to strike (ECF Dkt. No. 66) is GRANTED, defendants' motion for summary judgment (ECF Dkt. No. 48) is DENIED, in part, and plaintiff's motion for summary judgment (ECF Dkt. No. 54) is accordingly GRANTED, in part.  MetLife is to award Ms. Novick STD benefits for the entire twenty-six week period, adjusting for the payments already made, and her LTD benefits claim is REMANDED to defendants who must process the application and notify Ms. Novick, in writing, of their decision.

/S/          Richard K. Eaton
                    Judge

Dated:      December 17, 2012
                New York, New York

37